959 So.2d 390 (2007)
D.R. HORTON, INC. JACKSONVILLE, Appellant,
v.
John PEYTON, in his official capacity as Mayor of the City of Jacksonville, a Florida municipal corporation; and Michael Saylor, in his official capacity as Director of Planning and Development for the City of Jacksonville, a Florida municipal corporation, Appellees.
No. 1D05-5585.
District Court of Appeal of Florida, First District.
June 18, 2007.
*391 Fred D. Franklin, Jr., William D. Brinton, T.R. Hainline, Jr., Cristine M. Russell, and Christopher J. Hand of Rogers Towers, P.A., Jacksonville, for Appellant.
Cindy A. Laquidara, General Counsel and Tracey I. Arpen, Jr., Deputy General Counsel, Jacksonville, for Appellees.
Deborah J. Andrews, Ponte Vedra Beach, for Amicus Curiae Baymeadows Community Council, Inc.
VAN NORTWICK, J.
D.R. Horton, Inc.Jacksonville (Horton) appeals an order granting final summary judgment in favor of John Peyton, in his capacity as the mayor of the City of Jacksonville (the City), and Michael Saylor, in his capacity as director of planning and development for the City, appellees. Horton brought an action challenging the mayor's veto of a resolution of the Jacksonville City Council (Council) which had approved a so-called "fair share assessment contract" by which Horton was authorized to undertake a proposed development in the Baymeadows area of the City. Under section 6.05 of the City's Charter, the mayor does not possess the authority to veto, among other actions of the Council, "quasi-judicial decisions made by the council." Thus, the issue before us is whether the Council's decision approving the Horton resolution was quasi-judicial in nature. Because Horton's proposed development necessitated such substantial transportation infrastructure improvements, as provided in Horton's fair share contract with the City, that it would require an amendment to the capital improvement element of the City's comprehensive plan, we conclude that the Council's decision was legislative, not quasi-judicial in nature. Accordingly, we affirm the order upholding the mayor's veto, although for reasons different than those relied upon by the trial court.

Background
In 2004, Horton planned a multi-use development of the golf course within the Baymeadows community in the southeastern area of Jacksonville. The proposed development involved approximately 150 acres of real property and included approximately 1,400 residential dwellings, 150,000 square feet of office space, and 60,000 square feet of retail space. Horton sought a determination from the planning and development department of the City as to whether the proposed development of the subject property met local development requirements. More particularly, Horton sought a "concurrency certificate" showing that his proposed development fell within the development guidelines in the City's comprehensive plan. The City's planning and development department denied Horton's application for a concurrency certificate on the ground that the existing roads in the area of the development would be unable to handle the increased traffic resulting from the development, as determined by a traffic study. Under the authority of the fair share contract provisions of the City's ordinance code, Part 3, Chapter 655, Jacksonville Ordinance Code (Code), the department advised Horton of his available options, one of which was to submit a "fair share assessment" application to enter into a contract with the City by which Horton would pay for the cost of the infrastructure improvements made necessary by the proposed development. Horton submitted a fair share application that provided for a fair share payment of $4,894,875 and a proposed contract. Exhibit B to Horton's fair share application specified in detail the various roads which *392 would be improved pursuant to the funds provided under the fair share contract. Exhibit E to the fair share application provided that these roadway improvements "shall be added to the Capital Improvements Plan of the City, designating the Developer as the source of funding."
The resolution approving the Horton contract was assigned to the Transportation, Environment and Energy Committee of the Council. This committee held a public meeting and thereafter recommended to the Council that Horton's fair share contribution be increased to $7,142,403. The committee's recommendation was submitted to the Council and scheduled on the Council's agenda with other resolutions described in the agenda as "Action on 3rd Reading Resolution(s), Committee Recommendations." The agenda also contained a separate category of "quasi-judicial" actions to be heard by the Council.
In the public hearing before the Council, Horton introduced the results of a traffic study prepared by its consultant which supported the roadway improvements set forth in the proposed fair share contract. Opponents of the project presented testimony by a traffic engineer that Baymeadows Road, the only public road directly accessing the proposed development, is a "constrained facility," meaning it could not be expanded to provide transportation service beyond its current level of service; and that the transportation improvements proposed by Horton's fair share contract were not adequate to support the proposed development. Further, the opponents testified that proposed transportation improvements were not contained in the City's capital improvement program that is a part of the City's comprehensive plan and that most of the improvements which were in the capital improvement program were not within a two-mile radius of Horton's traffic study.
After extensive debate, by a vote of 11 to 8 the Council approved the amended Horton resolution which the mayor timely vetoed. In his veto letter, the mayor set forth the policy reasons supporting his action. He found that the proposed roadway improvements were inadequate to address the traffic impacts that would be created by the proposed development. As the mayor explained:
In this case, the proposed development will generate traffic impacting Baymeadows Road, as well as other roadway links. Specifically, the development is projected to add 1,182 PM Peak Hour trips to the three affected links of Baymeadows Road, as well as adding additional trips to other roadway links.
Baymeadows Road is a constrained facility, as defined by the Florida Department of Transportation, meaning that it cannot be widened further to add traffic capacity. While other constrained roadways exist within the city, few are failing to the same extent as Baymeadows Road, and few have the potential for the type of large-scale development that is proposed for Baymeadows Golf Course. Furthermore, due to the existing roadway configuration from past development, Baymeadows Road is the only public road directly accessing the property and the point of ingress and egress is from the most negatively-impacted links on Baymeadows Road.
Roadway improvements that add capacity to a roadway (other than road widening) are authorized by state and local law. However, those improvements must offset the impacts of the proposed development on the affected roadway links identified in the particular Fair Share Assessment Contract. For this particular project, the developer proposed *393 a list of roadway improvements other than widening Baymeadows Road to offset the impacts on Baymeadows Road and the other affected roadway links.
I have reviewed the evidence in the record regarding the proposed roadway improvements and their suggested impact on the affected roadway links. My review has led me to conclude that the proposed list of improvements is inadequate to address the traffic impacts which would be created by the proposed development. . . .
The Council considered overriding the veto, but failed to do so by a vote of 2 to 16.
Horton filed a petition for a writ of quo warranto in the circuit court for Duval County, asserting that in vetoing the resolution the mayor exceeded his authority under section 6.05 of the City's Charter. Alternatively, Horton sought a writ of mandamus to compel the execution and the implementation of the fair share contract. The mayor and the director of the City's planning department were named as respondents. The Baymeadows Community Council (BCC), comprised of residents in the Baymeadows community, was permitted to appear in the proceeding in opposition to the development.
The parties eventually moved for final summary judgment and submitted written argument in support of the respective positions; BCC also submitted argument. Following a hearing, the trial court entered a thoughtful and detailed order granting the City's motion for summary judgment. The trial court explained its ruling, in pertinent part, as follows:
The ultimate issue before the Court appears on the surface to be simple and discrete: Did the Mayor have the legal authority to veto the Council Resolution approving the Fair Share Assessment Agreement between Horton and the City? Any veto power the Mayor has is derived from Section 6.05, Jacksonville Municipal Code. The parties agree that thereunder, the Mayor does not have the authority to veto "Quasi-judicial decisions made by the council." On the other hand, under the Code, the Mayor does have the right to veto legislative type actions of the Council. The parties disagree here as to the character of the Resolution at bar.
A legislative action by a local governing body is one that results in the formulation of a general rule of policy. On the other hand, a quasi-judicial action results in the application of a general rule of policy. Board of County Commissioners of Brevard County v. Snyder, 627 So.2d 469, 474 (Fla.1993). Quasi-judicial hearings require that certain due process rights be granted to the affected parties. See, e.g., Walgreen Co. v. Polk County, 524 So.2d 1119 (Fla. 2d DCA 1988); Brown v. Walton County, 667 So.2d 376 (Fla. 1st DCA 1995). . . . In order to decide whether the Council action herein is quasi-judicial or legislative, then, it is essential that the Court determine the actual "character of the hearing." Board of County Commissioners of Brevard County v. Snyder, supra, at 474. . . .
* * *
It appears to this Court that if the City of Jacksonville were to lawfully adopt a Fair Share Assessment Contract under the statute and Code provisions here, its action would be quasi-judicial in character. Though the Jacksonville Municipal Code appears to grant the Jacksonville City Council some discretion in such matters, it is very specific as to the requirements for adoption. Thus, under existing law, the Council is not required to make policy-type decisions. It is *394 only required to implement policy decisions by considering whether the lawful requirements for a Fair Share Assessment Contract have been met; and whether the funding to be paid by the developer thereunder is adequate to meet concurrency requirements under the Comprehensive Plan's CIP [Capital Improvement Program] provisions. The problem with the Council action at bar, however, is that it does not come close to meeting the lawful requirements for adopting a Fair Share Assessment Contract.
* * *
In the end, counsel for Horton admitted herein that the Fair Share Assessment Agreement before the Council did nothing more than establish an amount of money which Horton would have to pay to the City to proceed with its development. It left the "how and when" of the use of that money to the total future discretion of the City. As such, the agreement did not even pretend to contemplate capital improvements already contained in the City's CIP, which need to be implemented within the next five years. The adopted agreement, in short, was completely unlawful.
This Court cannot conceive how the Council's decision to adopt an unlawful Fair Share Assessment Agreement could be in the character of a quasi-judicial action. If the Council has decided that it should adopt Fair Share Assessment Agreements which are in derogation of the law, they are surely acting in a policy-making capacity. . . .
(Emphasis in bold typeface provided by trial court). Thus, the trial court upheld the mayor's veto. This appeal follows.
Horton argues on appeal that the trial court erred in holding that the Council's approval of the resolution was unlawful and that the Council's conduct was transformed from a quasi-judicial act into a legislative one subject to a mayoral veto as a result of the unlawful resolution. Not conceding that the contract was illegal, Horton observes that the trial court cited no authority for its reasoning that an unlawful contract transformed Council action from quasi-judicial into legislative. He argues further that it is the character of a hearing which determines whether or not county or municipal action is legislative or quasi-judicial pursuant to Board of County Commissioners of Brevard County v. Snyder, 627 So.2d 469, 474 (Fla.1993), and it is evident that the proceeding below resulted in quasi-judicial and not legislative action under Snyder. The legality vel non of a decision, Horton adds, is not a valid consideration under the supreme court's analysis in Snyder, arguing that other courts have held that the quasi-judicial character of a local government's decision does not change merely because the decision is contrary to a statute or city ordinance, citing in support of this argument: Grace v. Town of Palm Beach, 656 So.2d 945 (Fla. 4th DCA 1995), Hirt v. Polk County Bd. of County Comm'rs, 578 So.2d 415 (Fla. 2d DCA 1991), and Sun Ray Homes, Inc. v. County of Dade, 166 So.2d 827, 828-29 (Fla. 3d DCA 1964).
The City argues, on the other hand, that consideration of Horton's proposed Fair Share contract required the Council to evaluate the likely impact of that contract on the City's provision of local services, capital expenditures, and its overall plan for the managed growth and future development of the area, and, thus, the City was engaged in policy formulation. Furthermore, the City asserts that the Council's decision whether to approve a proposed contract, such as the one at issue here, necessarily involved considerations well beyond a specific landowner's property. Because the Council was required to evaluate *395 the proposed fair share contract pursuant to the factors outlined in section 655.302(a) of the Code, the Council's conduct was legislative. Therefore, the City argues the Council's action in approving the contract was analogous to the adoption of amendments to a comprehensive plan as discussed in Martin County v. Yusem, 690 So.2d 1288 (Fla.1997). In the City's view, the trial court reached the right conclusionthat the mayor had the authority to veto the resolution adopting Horton's fair share contractbut for the wrong reason. Any illegality of the contract was not the basis of the mayor's veto authority; instead, it is the inherent legislative nature of the process of adopting a Fair Share contract which makes such a contract subject to a mayoral veto. Thus, the City concludes, the trial court's decision to uphold the veto should be affirmed under the "tipsy coachman rule." See Dade County School Bd. v. Radio Station WQBA, 731 So.2d 638, 644 (Fla.1999).

Governing Statutes and Ordinances
Florida's Growth Policy Act, part II of Chapter 163, Florida Statutes (2005), "was intended to enhance present advantages and encourage appropriate uses of land and resources." Martin County v. Yusem, 690 So.2d 1288, 1292 (Fla.1997). In this act, the legislature required each Florida local government to adopt a comprehensive plan that prescribes "principles, guidelines and standards for the orderly and balanced future economic, social, physical, environmental, and fiscal development of the area." § 163.3177(1), Fla. Stat. (2005). A comprehensive plan must include several elements, section 163.3177(2), including "a capital improvement element designed to consider the need for and the location of public facilities in order to encourage the efficient utilization of such facilities. . . ." § 163.3177(3)(a). Among other things, the capital improvement element must set forth a plan covering at least a five-year period "which outlines principles for construction, extension or increase in capacity of public facilities . . .," section 163.3177(3)(a)(1), and a schedule of capital improvements "which includes publicly funded projects, and which may include privately funded projects . . ., necessary to ensure that adopted level-of-service standards are achieved and maintained." § 163.3177(3)(a)(5). The capital improvements element is required to be reviewed on an annual basis and modified by ordinance to maintain a financially feasible five-year schedule of capital improvements. § 163.3177(3)(b)(1). A copy of any ordinance modifying the element is required to be transmitted to the state land planning agency. Id.
In section 163.3177(10)(h), the legislature created what has become known as a concurrency requirement. In this subsection, the legislature requires "that public facilities and services needed to support development shall be available concurrent with the impact of such development in accordance with s. 163.3180." As for transportation facilities relevant here, section 163.3180(2)(c) mandates that "[c]onsistent with the public welfare, and except as otherwise provided in this section, transportation facilities needed to serve new development shall be in place or under actual construction within 3 years after the local government approves a building permit or its functional equivalent that results in traffic generation." The City has adopted a concurrency management system "to ensure the availability of public facilities and the adequacy of those facilities at adopted levels of service concurrent with the impacts of development." Section 655.102, Jacksonville Ordinance Code.
Under the statutory scheme, however, development may proceed even where transportation facilities are not currently *396 available. Section 163.3180(11), Florida Statutes, provides:
In order to limit the liability of local governments, a local government may allow a landowner to proceed with development of a specific parcel of land notwithstanding a failure of the development to satisfy transportation concurrency, when all the following factors are shown to exist:
(a) The local government with jurisdiction over the property has adopted a local comprehensive plan that is in compliance.
(b) The proposed development would be consistent with the future land use designation for the specific property and with pertinent portions of the adopted local plan, as determined by the local government.
(c) The local plan includes a financially feasible capital improvements element that provides for transportation facilities adequate to serve the proposed development, and the local government has not implemented that element.
(d) The local government has provided a means by which the landowner will be assessed a fair share of the cost of providing the transportation facilities to serve the proposed development.
(e) The landowner has made a binding commitment to the local government to pay the fair share of the cost of providing the transportation facilities to serve the proposed development.
(Emphasis added). The fourth and fifth factors in this subsection require that, to allow development to proceed without satisfying transportation concurrency, the local government must have provided a means by which an owner or developer will be assessed a "fair share" of the costs of providing the transportation facilities necessary to serve the proposed development and that an owner or developer must have contracted with the local government to pay its fair share of the cost of providing such transportation facilities. § 163.3180(11)(d) and (e).
The City, acting pursuant to this statute, adopted fair share assessment procedures in Part 3 of Chapter 655 of the Code. To proceed with development, notwithstanding a failure to meet transportation concurrency, a landowner or developer must meet five requirements set forth in section 655.303(b) of the Code.[1] These requirements are similar, but not identical, to the factors set forth in section 163.3180(11), Florida Statutes.
*397 The City's government follows a structure known as a "strong-mayor" model. See generally, Richard C. Schragger, Can Strong Mayors Empower Weak Cities? On the Power of Local Executives in a Federal System, 115 Yale L.J. 2542, 2544-45, 2570-77 (2006). The City's Charter allocates executive and legislative power and responsibility between the mayor and the Council respectively. § 4.02, Jacksonville Charter. Charter section 6.05 provides broad veto power to the mayor, restricting the veto authority in only seven specific areas, as follows:
Section 6.05. Mayor's veto power.
The mayor may veto any ordinance or resolution adopted by the council except ordinances and resolutions relating to:
(a) Consolidation of the urban services districts.
(b) Appointments to the zoning board and the building codes adjustment board.
(c) Zoning exceptions and variances.
(d) The auditor, the secretary of the council, or other employees of the council.
(e) Internal affairs of the council.
(f) Investigations by the council or any duly appointed committee thereof.
(g) Quasi-judicial decisions made by the council.

(Italics added).

Local Government Quasi-Judicial and Legislative Actions
The trial court found that the Horton fair share contract was unlawful because it did not contemplate the improvements currently within the City's capital improvement plan which the City's comprehensive plan requires to be implemented within the next five years. Thus, the trial court reasoned that, since the fair share contract was unlawful, when the Council adopted an unlawful contract, it must have been acting in a policy-making legislative capacity. We agree with the parties that the reasoning of the trial court was in error. Even if the fair share contract were unlawful, a matter we do not address,[2] the Council's approval of a contract that is contrary to other ordinances or its comprehensive plan contract does not necessarily render the Council's act legislative in nature. See, e.g., Grace v. Town of Palm Beach, 656 So.2d at 946.
Nevertheless, as argued by appellees, the trial court was correct in ruling that the Council's action was legislative in nature, and subject to the mayor's veto power, for reasons other than those upon which the trial court based its ruling. When the trial court reaches the right result, but for the wrong reasons, that decision will be upheld on appeal if there is any basis which would support the judgment in the record. Dade County School Board v. Radio Station WQBA, 731 So.2d at 644-45; see also Applegate v. Barnett Bank, 377 So.2d 1150, 1152 (Fla.1979); Cohen v. Mohawk, Inc., 137 So.2d 222, 225 (Fla.1962)("[T]he judgment of the trial court reached the district court clothed with a presumption in favor of its validity. . . . Accordingly, if upon the pleadings and evidence before the trial court, there was any theory or principle of law that would support the trial court's judgment in favor of the plaintiffs, the district court was obliged to affirm that judgment."). In Florida jurisprudence, this principle is frequently referred to as the "tipsy coachman" *398 rule. Home Depot U.S.A. Co. v. Taylor, 676 So.2d 479, 480 (Fla. 5th DCA 1996).
Neither the Charter nor the Code defines the term "quasi-judicial." This term, as well as the term "legislative," has been considered by the Florida Supreme Court in the context of actions by local governmental entities in Board of County Commissioners of Brevard County v. Snyder, 627 So.2d 469 (Fla.1993); Martin County v. Yusem, 690 So.2d 1288 (Fla.1997); and Coastal Development of North Florida, Inc. v. City of Jacksonville Beach, 788 So.2d 204 (Fla.2001). In Snyder, Yusem, and Coastal Development, the Court analyzed the concepts of quasi-judicial and legislative actions in the context of addressing a separation of powers issue between the legislative branch, in this instance the legislative body of a municipal government such as the Council here, and the judicial branch. Snyder, 627 So.2d at 474-75, Yusem, 690 So.2d at 1293-94, and Coastal Development, 788 So.2d at 205-06. The Court held that, when local governmental bodies undertake legislative actions, a reviewing court's standard of review must provide "deference to the policy-making function of a board when acting in a legislative capacity. . . ." Snyder, 627 So.2d at 474. Accordingly, legislative actions "will be sustained as long as they are fairly debatable. On the other hand, the rulings of a board acting in its quasi-judicial capacity . . . will be upheld only if they are supported by substantial competent evidence." Id. Thus, to determine the judiciary's standard of review, a court must first determine whether the action under review was legislative or quasi-judicial.
In the case under review, however, we are considering the scope of the mayor's veto authority granted under section 6.05 of the City's Charter, not the standard of review that constrains the scope of judicial review. Further, we are not concerned with a matter of the executive branch (the mayor) deferring to the legislative branch (the Council), but a matter of interpretation of a provision of the City's Charter. Section 6.05 of the Charter prohibits the mayor from vetoing the Council's quasi-judicial actions, but allows the mayor to veto the Council's policy-making legislative actions. Although we are not required to address whether the applications of the concepts of "quasi-judicial" in such materially different circumstances from those of Snyder, Yusem and Coastal Development, might lead us to adopt different definitions in the context of the case before us, our discussion of these terms here should be seen as solely relating to the restriction on the mayor's authority under section 6.05 of the Charter. With these considerations in mind, we will address the definitions of quasi-judicial as developed in Snyder, Yusem, and Coastal Development.
In Snyder, the Florida Supreme Court reviewed the district court of appeal's grant of a petition for writ of certiorari with respect to the denial by the Board of County Commissioners of Broward County of a rezoning application of a one-half acre parcel which was consistent with the county's comprehensive plan. Recognizing that zoning decisions were historically considered legislative acts of local government, 627 So.2d at 472, the Court held that the board's action was quasi-judicial. Id. at 474-75. The Court outlined four characteristics of a quasi-judicial decision: (1) quasi-judicial action results in the application of a general rule of policy, whereas legislative action formulates policy; (2) a quasi-judicial decision has an impact on a limited number of persons or property owners and on identifiable parties and interests, while a legislative action is open-ended and affects a broad class of individuals *399 or situations; (3) a quasi-judicial decision is contingent on facts arrived at from distinct alternatives presented at a hearing, while a legislative action requires no basis in fact finding at a hearing; and (4) a "quasi-judicial act determines the rules of law applicable, and the rights affected by them, in relation to past transactions," while a legislative act prescribes what the rule or requirement shall be with respect to future acts. Id. at 474.
In Yusem, the Court considered whether an amendment of a local government's comprehensive plan, by which the allowed property density was increased as a part of a request to rezone a 54-acre parcel, was a legislative or a quasi-judicial action. 690 So.2d at 1293-94. Martin County had denied the landowner's request to amend the land use map that was a part of the county's comprehensive plan and to rezone the subject property; and the owner filed suit seeking declaratory and injunctive relief. The trial court found that the county erred in denying the landowner's application, but the district court of appeal reversed. The Supreme Court undertook review and, relying heavily on the dissent authored by (then) Judge Pariente, the Supreme Court concluded that an amendment to a comprehensive plan, like the initial adoption of the plan itself, is the result of the formulation of policy. Id. at 1293-94. As such, it is in the nature of a legislative action. Thus, the Supreme Court established a bright-line rule: the decision to amend a comprehensive land use plan is a legislative decision, even if the amendment affects only a single parcel of property. Id. at 1293-95.
In Coastal Development, the Jacksonville Beach City Council denied a proposed small-scale development amendment to the City's comprehensive plan, which the developer sought pursuant to section 163.3187(1)(c), Florida Statutes (1996), to commercially develop a 1.7 acre parcel. The circuit court granted certiorari relief and ordered the City to grant the developer's application, ruling that the City Council's decision was quasi-judicial in nature. 788 So.2d at 205-06. This court granted the City's petition for writ of certiorari, holding that the City's decision was legislative, not quasi-judicial, and certified a question of great public importance. Id. at 206. On review, the Court held that decisions regarding small scale development amendments are legislative in nature. The Court noted that the process of adopting small scale development amendments differed from regular comprehensive plan developments considered in Yusem, id. at 207, and "may not involve a change to the textual goals, policies or objectives of the comprehensive plan." Id. Nevertheless, because small scale development amendments involve changes to the future land use element of the comprehensive plan, the change involved a policy decision and was legislative in nature. Id. at 209. As the Court explained:
It seems to us that all comprehensive plan amendment requests necessarily involve the formulation of policy, rather than its mere application. Regardless of the scale of the proposed development, a comprehensive plan amendment request will require that the governmental entity determine whether it is socially desirable to reformulate the policies previously formulated for the orderly future growth of the community. This will, in turn, require that it consider the likely impact that the proposed amendment would have on traffic, utilities, other services, and future capital expenditures, among other things. That is, in fact, precisely what occurred here. Such considerations are different in kind from those which come into play in considering a rezoning request.
*400 Id. (quoting City of Jacksonville v. Coastal Development of North Florida, Inc., 730 So.2d 792, 794 (Fla. 1st DCA 1999); italics supplied by Supreme Court). The Court emphasized that "our conclusion in this case reinforces our policy underlying Yusem, which was to promote uniformity and certainty in land use planning decisions." Id.
We read section 6.05 of the Charter as granting to the mayor a role equal to the Council in policy-making decisions. While the Council performs the legislative role in enacting ordinances, the mayor has the authority to veto, subject to Council override, the Council's legislative acts. The Council, however, has exclusive authority with respect to quasi-judicial actions involving the application of existing policy or law to facts presented to it.
In the case under review, we conclude that the Council's decision to approve Horton's fair share assessment contract was a policy decision which was legislative in nature, similar to the decision made by the Jacksonville Beach City Council in Coastal Development. In reviewing Horton's contract, the Council did not simply apply the provisions of section 655.303(b) of the Code to the facts relating to the fair share contract. Similar to the land use amendment considered in Yusem, consideration of the Horton fair share assessment contract required the Council, and later the mayor, to evaluate the likely impact of that contract on the City's provision of local services, on its planned capital expenditures, and on its overall plan for the managed growth and future development of the surrounding area. As is apparent from the record, the decision whether to approve the proposed contract involved considerations well beyond Horton's 150-acre development.
Further, despite subsection (3) of section 655.303(b), Jacksonville Ordinance Code, which requires that the "proposed development [be] consistent with the comprehensive plan," the Council here approved a fair share contract which requires future changes to the comprehensive plan. Under the express terms of Horton's fair share contract, the City was obligated to add previously unplanned roadway capacity to its capital improvement program to provide the transportation infrastructure necessary to address the transportation impact of the proposed development within and beyond the immediate area of the proposed development. These roadway additions will require amendments to the capital improvements element of the City's comprehensive plan. Compare Yusem, 690 So.2d at 1294. Thus, in considering the Horton fair share contract, the Council and mayor necessarily were required to evaluate the impact of the proposed development on the City's overall transportation facilities and expenditures, including its ability to provide for future growth. As with the amendment to the future land use element in Coastal Development, in amending its capital improvement program, here the City must "determine whether it is socially desirable to reformulate the policies previously formulated for the orderly future growth of the community." 788 So.2d at 209 (quoting Coastal Development, 730 So.2d at 794).
For these reasons, we conclude that the Council's resolution approving Horton's fair share contract was not a quasi-judicial action. Thus, the Council's action was subject to the mayor's veto power under section 6.05 of the Charter.
Although the Council's designation of a matter as a quasi-judicial or legislative ordinance would not be determinative with respect to the nature of the Council's decision, see generally, 5 McQuillan Mun. *401 Corp. § 16.41 (3d ed.2006), our holding here is consistent with the manner in which the Council itself viewed Horton's fair share contract. As noted above, the fair share contract was considered by the Council as a resolution. The agenda for the Council makes a distinction between Council "resolutions" and "quasi-judicial" actions. The Council's agenda for the meeting at which the Horton resolution was considered lists seven such "quasi-judicial" ordinances to be heard at that Council session. Approval of Horton's fair share contract, however, was not listed as a "quasi-judicial" matter and was not heard as such.
AFFIRMED.
WEBSTER and BENTON, JJ., concur.
NOTES
[1] Under section 655.303(b) of the City Code, the five requirements which all must be met before development under a fair share agreement may proceed are:

(1) The comprehensive plan is in compliance as of the effective date of the fair share assessment contract;
(2) The proposed development is consistent with the comprehensive plan;
(3) The five-year Capital Improvement Program "CIP" provides for transportation projects which, upon completion, will provide transportation facilities adequate to serve the proposed development;
(4) The Department has calculated the fair share of the cost of providing of transportation facilities necessary to serve the proposed development according to the formula established in Section 655.304(a) herein and the assessment has a reasonable relationship to the transportation impact generated by the proposed development;
(5) The landowner or developer has executed a fair share assessment contract, on a standardized form approved by the office of General Counsel and the Council Auditor's Office, and has agreed to pay the City the amount assessed prior to the issuance of any final development order or final development permit in connection with the proposed development, or has agreed to construct specific roadway improvements specifically identified in the fair share assessment contract and provide a bond.
[2] In the action below, the parties did not directly challenge the legality of the Council's action approving the fair share contract. Further, on appeal, the appellees do not argue that Horton's fair share contract was unlawful. Accordingly, we do not address the trial court's conclusion regarding the contract's legality.