IN THE DISTRICT COURT OF APPEAL

FIRST DISTRICT, STATE OF FLORIDA

GRETNA RACING, LLC,

      Appellant,

v.

DEPARTMENT OF BUSINESS
AND PROFESSIONAL
REGULATION, DIVISION OF
PARI-MUTUEL WAGERING,

      Appellee.

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D14-3484

**CORRECTED PAGES: pgs 3, 6, 15, 17**

**CORRECTION IS UNDERLINED IN RED**

**MAILED: October 5, 2015**

**BY: NMS**

_____/

Opinion filed October 2, 2015.

An appeal from a Final Order of the Department of Business and Professional Regulation.

Marc W. Dunbar, Tallahassee and David S. Romanik of David S. Romanik, P.A., Oxford, for Appellant.

David J. Weiss of Ausley & McMullen, P.A., Tallahassee, for Amicus Curiae Gadsden County, Florida in support of Appellant.

Pamela Jo Bondi, Attorney General, Allen Winsor, Solicitor General, Adam S. Tanenbaum, Chief Deputy Solicitor General, and Jonathan A. Glogau, Chief, Complex Litigation, Tallahassee, for Appellee.

1

## ON MOTION FOR REHEARING

MAKAR, J.

Gadsden County, where the pari-mutuel facilities of Gretna Racing, LLC., are located, held a countywide non-binding vote in January 2012, the result of which showed that the sentiments of a majority of its electorate favor slot machines at those facilities. Based upon that vote, Gretna Racing now seeks a license for slot machines. Via local referenda authorized by a 2004 state constitutional amendment, however, slot machines were approved and are currently permitted in only two Florida counties: Miami-Dade and Broward. Art. X, § 23, Fla. Const. The question in this statutory interpretation case is whether the Legislature intended to allow expansion of slot machines via local referendum into all other Florida counties in like manner through a 2009 enactment. See Ch. 2009-170, Laws of Florida, § 19 (amending section 551.102(4), Fla. Stat.). Because the Gadsden County vote was not an authorized "referendum," amounting to only a non-binding vote of the electorate, it has no binding legal effect. Moreover, nothing in the language, structure, or history of slot machine legislation, including section 551.102(4), Florida Statutes, provides authorization for the holding of slot machine referenda in counties other than Miami-Dade and Broward counties. The

2

administrative order denying issuance of a slot machine license to Gretna Racing is upheld. [1]

## I.

### A. The 1885 Constitution

Florida has no history or tradition of allowing slot machines within its borders. To the contrary, other than a very brief period in the State's history—a depression era lacuna from about 1935 to 1937 when the state legislature and the state supreme court were briefly in synch over their legality in highly limited circumstances—slot machines have been prohibited as unlawful lotteries from statehood until the recent passage of a constitutional amendment in 2004 authorizing referenda in Miami-Dade and Broward Counties to permit their usage (more on that later).

The 1885 Constitution prohibited lotteries. Art. III, § 23 (1885) ("Lotteries are hereby prohibited in this State."). As mechanical slot machines developed shortly before the turn of the century, they were generally considered within this

---

[1] Due to the retirement of a panel member soon after the issuance of our original opinions, three things happened. First, a motion for rehearing and rehearing en banc was filed upon which the Court's members began voting as to the latter. Second, via random assignment, a replacement for the retired panel member was done administratively. Third, in light of the reconstitution of the panel, the en banc Court all but unanimously voted to abate its vote on the pending motion for en banc review to allow the panel to consider the case anew, which we have done, granting the motion for rehearing and substituting this opinion.

prohibition. Because the 1885 Constitution did not define the scope of what constituted a lottery, the Legislature had a degree of flexibility in determining its definitional parameters, which it exercised by enacting the State's first slot machine statute in 1935, allowing for their use. By doing so, the Florida Supreme Court was put in the position of deciding whether slot machines were impermissible under the state constitution's anti-lottery provision, resulting in a judicial decision that altered the three-part lottery test that had prevailed since shortly after the 1885 Constitution was enacted (a lottery = prize + chance + consideration). In an adroit ruling, the supreme court added a fourth part to the test—widespread operation—which allowed the use of slot machines unless they became too prevalent. That decision, Lee v. City of Miami, 163 So. 486 (Fla. 1935), upheld the facial validity of a statute allowing the use of specified slot machine-like devices, but held that their widespread use might amount to an impermissible lottery under the constitutional prohibition. Id. at 490 ("It may be that some of [the coin-operating vending machines], or possibly all of them in their operation, will become [illegal lotteries]; but we leave that question to be determined when a specific case arises."); see also Hardison v. Coleman, 164 So. 520, 524 (Fla. 1935) (lotteries include "such gambling devices or methods which because of their wide or extensive operation a whole community or country comes within its contaminating influence"). Thus, as of 1935, a limited class of slot

4

machines were deemed permissible, and were authorized by legislative act, so long

as their use was not widespread or extensive across a community. Slot machines,

like the proverbial camel's nose under the tent, rapidly proliferated but soon fell in

disfavor due to their widespread use and deleterious effects.[2] As one commentator

has noted:

> When the Florida Supreme Court decided *Lee* and *Hardison* in 1935, it must have viewed slot machines as novelties and standalone devices, like Mr. Hardison's slot machine, as opposed to paper lottery tickets, which could be sold and distributed all over a community. Things did not unfold in the next two years in the way the Florida Supreme Court apparently expected in 1935. In 1937, the Florida comptroller, the same J.M. Lee who had prevailed in *Lee*, prepared a document for Florida Governor Fred Cone estimating there to be 10,000 slot machines with total yearly play of $52 million in Florida. Even children were allowed to gamble on these machines. Slot machines in their actual operation had collectively turned out to be widespread and lotteries under *Lee*'s criteria, but the Florida Supreme Court did not have a case to revisit the issue directly. Instead, the legislature and Governor Cone took matters into their own hands by repealing the 1935 slot machine statute in 1937. The vote for repeal in the legislature was overwhelming. This repeal statute, which also banned slot machines, was authored and vigorously championed by a young representative and future Florida governor named LeRoy Collins, who called the two-year experience with slot machines "a dose of moral poison."

---

[2] See generally Stephen C. Bousquet, The Gangster in Our Midst: Al Capone in South Florida 1930-1947, 76 Fla. Hist. Q. 297, 307 (1998) (history of gangster Al Capone in Miami, noting that "wide-open gambling rackets in South Florida stretched from Coral Gables north to Fort Lauderdale" and that the "legalization of racetrack betting in 1931, and of slot machines four years later, made South Florida a mecca for gamblers.").

David G. Shields, Slot Machines in Florida? Wait A Minute, Fla. B.J., Sept./Oct. 2013, at 12 (footnotes omitted). In two years, a complete turn of the wheel had occurred; slot machines were prohibited once again. By 1939, the three-part test was back in force; the "widespread operation" part that the court temporarily relied upon to legitimize slot machines was now absent. See Little River Theatre Corp. v. State ex rel. Hodge, 185 So. 855, 861 (Fla. 1939) ("The authorities are in accord that a lottery has three elements; first, a prize; second, an award by chance; and, third, a consideration."). And slot machines were again relegated to nothing more than a societal menace. Pasternack v. Bennett, 190 So. 56, 57 (Fla. 1939) ("[I]t is definitely settled in this jurisdiction that those devices commonly known as slot machines are gambling devices; that the use and operation of them has a baneful influence on the persons who indulge in playing them and that they constitute such a menace to public welfare and public morals as to be subject to the police power of the State to regulate, control, prohibit or destroy them.").

## B. The 1968 Constitution

Over three decades passed before the issue of lotteries arose again. In adopting a new state constitution, the people of the State of Florida included an anti-lottery provision that drew upon the 1885 Constitution's ban of all lotteries with the limitation that certain existing types of pari-mutuel pools would be allowed to continue. The new anti-lottery provision stated: "Lotteries, other than

6

the types of pari-mutuel pools authorized by law as of the effective date of this constitution, are hereby prohibited in this state." Art. X, § 7, Fla. Const. (1968). In essence, the 1968 constitutional revision cemented in place the statewide ban on all types of lotteries (which would include slot machines used on a widespread basis), allowing only the limited types of gaming that then existed by law.

This point was made in a case out of Jacksonville, Florida, in which the legality of bingo was questioned under the new constitution. By close vote, the Florida Supreme Court held that because bingo was legislatively authorized at the time of article X, section 7's enactment, it was grandfathered in as a permissible lottery.

> Obviously, the makers of our 1968 Constitution recognized horse racing as a type of lottery and a 'pari-mutuel pool' but also intended to include in its sanction those other lotteries then legally functioning; namely, dog racing, jai alai and bingo. *All other lotteries including bolito, cuba, slot machines, etc., were prohibited.*

Greater Loretta Imp. Ass'n v. State ex rel. Boone, 234 So. 2d 665, 671-72 (Fla. 1970) (emphasis added). As the highlighted language makes evident, the supreme court—consistent with article X, section 7's clear language—drew a bright line: existing "lotteries" such as pari-mutuel pools for dog racing, jai alai and bingo survived; all other "lotteries" including "slot machines" were impermissible. Whatever authority the Legislature may have previously had to allow these types of gaming was gone. A broad definition of lottery now prevailed, one that included

7

slot machines, but which excluded gaming then-sanctioned by legislation. A new era was ushered in, one in which a constitutional amendment was necessary to allow any type of activity broadly understood as a lottery under article X, section 7 other than those grandfathered in. This understanding of the constitutional language, as interpreted in Greater Loretta was put into doubt in 2004, as the next section explains.

### C. The 2004 Slots Amendment and Chapter 551

After the decision in Greater Loretta, interest in expanding gaming in Florida via constitutional amendment increased. Various failed proposals were attempted.[3] In the 1986 general election, however, the state constitution was amended to authorize a state-run lottery whose net proceeds would be put in a state education trust fund. Art. X, § 15(a), Fla. Const. ("Lotteries may be operated by the state.").

Starting in 2002, an effort was made to amend the constitution to allow slot machines in all counties by local referenda. Proposed section 19(a) of the amendment stated:

---

[3] See, e.g., Floridians Against Casino Takeover v. Let's Help Florida, 363 So. 2d 337 (Fla. 1978) (proposed amendment to authorize state-regulated, privately operated casino gambling in Dade and Broward Counties with tax revenues to be used for education and local law enforcement purposes) (allowed on ballot, but failed).

(a) Slot machines are hereby permitted in those counties where the electorate has authorized slot machines pursuant to referendum, and then only within licensed pari-mutuel facilities (*i.e.,* thoroughbred horse racing tracks, harness racing tracks, jai-alai frontons, and greyhound dog racing tracks) authorized by law as of the effective date of this section, which facilities have conducted live pari-mutuel wagering events in each of the two immediately preceding twelve month periods.

Advisory Op. to the Att'y. Gen. re Authorization for Cnty. Voters to Approve or Disapprove Slot Machines Within Existing Pari-Mutuel Facilities, 813 So. 2d 98, 99 (Fla. 2002). The proposal was held to violate the single subject requirement and was thereby removed from the ballot.

In 2004, a more limited constitutional amendment was proposed "that would permit two Florida counties to hold referenda on whether to permit slot machines in certain parimutuel facilities." Advisory Op. to the Att'y. Gen. re Authorizes Miami-Dade & Broward Cnty. Voters To Approve Slot Machines In Parimutuel Facilities, 880 So. 2d 522 (Fla. 2004) ("Advisory Op. re: Slot Machines").[4] Those

---

[4] The proposal was as follows:

Article X, Florida Constitution, is hereby amended to add the following as section 19:

SECTION 19. **SLOT MACHINES**-

(a) After voter approval of this constitutional amendment, the governing bodies of Miami-Dade and Broward Counties each may hold a county-wide referendum in their respective counties on whether to authorize slot machines within existing, licensed

9

opposing the so-called Slots Amendment argued in their briefs that the amendment, if passed, would allow a form of lottery and thereby amend the anti-lottery provision of the constitution without saying so in the ballot summary. No party cited Greater Loretta, nor did the Florida Supreme Court in its advisory opinion, which said—contrary to both Greater Loretta's statement that slot

> parimutuel facilities (thoroughbred and harness racing, greyhound racing, and jai-alai) that have conducted live racing or games in that county during each of the last two calendar years before the effective date of this amendment. If the voters of such county approve the referendum question by majority vote, slot machines shall be authorized in such parimutuel facilities. If the voters of such county by majority vote disapprove the referendum question, slot machines shall not be so authorized, and the question shall not be presented in another referendum in that county for at least two years.
>
> (b) In the next regular Legislative session occurring after voter approval of this constitutional amendment, the Legislature shall adopt legislation implementing this section and having an effective date no later than July 1 of the year following voter approval of this amendment. Such legislation shall authorize agency rules for implementation, and may include provisions for the licensure and regulation of slot machines. The Legislature may tax slot machine revenues, and any such taxes must supplement public education funding statewide.
>
> (c) If any part of this section is held invalid for any reason, the remaining portion or portions shall be severed from the invalid portion and given the fullest possible force and effect.
>
> (d) This amendment shall become effective when approved by vote of the electors of the state.

Advisory Op. re: Slot Machines, 880 So. 2d at 522-23. After passage, it was placed in section 23 of article X rather than section 19.

10

machines are an impermissible type of lottery under the 1968 constitution, and the holdings in Lee and Hardison that slot machines would be impermissible lotteries if in widespread use—that slot machines are *not* a form of lottery. Id. at 525. In doing so, the supreme court relied only on its 1930s decisions in Lee and Hardison, citing them for the proposition that the court had "long since settled the question of whether slot machines constitute lotteries." Id. at 525. On its face, the supreme court's advisory opinion overlooked its precedent in Greater Loretta and misapprehended the limited scope of Lee and Hardison, which during their fleeting shelf lives in the 1930s never authorized slot machines on a widespread basis.

To effectuate the Slots Amendment, the Legislature in 2005 enacted Chapter 551, Florida Statutes, entitled "Slot Machines", which laid out the authority for slot machines in Miami-Dade and Broward Counties and the manner in which they would be regulated. As to authority, the statute in section 551.101, entitled "**Slot machine gaming authorized**," stated—and still states today—as follows:

> Any licensed pari-mutuel facility located in Miami-Dade County or Broward County existing at the time of adoption of s. 23, Art. X of the State Constitution that has conducted live racing or games during calendar years 2002 and 2003 may possess slot machines and conduct slot machine gaming at the location where the pari-mutuel permitholder is authorized to conduct pari-mutuel wagering activities pursuant to such permitholder's valid pari-mutuel permit provided that a majority of voters in a countywide referendum have approved slot machines at such facility in the respective county. Notwithstanding any other provision of law, it is not a crime for a person to participate

11

in slot machine gaming at a pari-mutuel facility licensed to possess [slot machines] and conduct slot machine gaming or to participate in slot machine gaming described in this chapter.

§ 551.101, Fla. Stat.; Ch. 2005-362, § 1, Laws of Fla. The bracketed phrase was added in 2007. Ch. 2007-5, § 129, Laws of Fla. No other change has been made to this section, which specifies the breadth of the counties for whom authorization is explicitly authorized: Miami-Dade and Broward only.

This point was emphasized in an inter-branch dispute over the State's gaming compact with the Seminole Tribe. See Fla. House of Reps. v. Crist, 999 So. 2d 601, 614 (Fla. 2008) ("The state's constitution authorizes the state lottery, which offers various Class III games, *and now permits slot machines in Miami–Dade and Broward Counties*.") (emphasis added). Indeed, in holding that Governor Crist exceeded his authority in signing a compact with the Seminole Tribe that allowed for gaming that was illegal under Florida law, the Florida Supreme Court said "[i]t is . . . undisputed . . . that the State prohibits all other types of Class III gaming, including lotteries not sponsored by the State *and slot machines outside Miami–Dade and Broward Counties*." Id. (emphasis added). In other words, as of 2008, the supreme court recognized that slot machines continued to be illegal other than in Miami-Dade and Broward Counties, seemingly in conflict with the supreme court's 2004 statement in Advisory Opinion re: Slot Machines.

12

D. The 2009 Amendments to Chapter 551

Because the gaming compact with the Seminole Tribe had just been deemed illegal, during its next general session in 2009 the Florida Legislature was consumed with enacting legislation to ensure a legal compact was achieved, which resulted in last minute legislative ping-pong between the Senate and House to finalize what ultimately was chapter 2009-170, Laws of Florida. What began and progressed through the session as a bill devoted entirely to the Seminole Tribe gaming compact issue, Senate Bill 788 ultimately morphed into a final bill that also included the amendment to section 551.102(4) at issue here.

During the conference committee process, the following amendment to section 551.102 was added and approved:

551.102. Definitions.
As used in this chapter, the term:

(4) "Eligible facility" means any licensed pari-mutuel facility located in Miami-Dade County or Broward County existing at the time of adoption of s. 23, Art. X of the State Constitution that has conducted live racing or games during calendar years 2002 and 2003 and has been approved by a majority of voters in a countywide referendum to have slot machines at such facility in the respective county; any licensed pari-mutuel facility located within a county as defined in s. 125.011, provided such facility has conducted live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required license fee, and meets the other requirements of this chapter; or any licensed pari-mutuel facility in any other county in which a majority of voters have approved slot machines at such facilities in a countywide referendum held pursuant to a statutory or

> constitutional authorization after the effective date of this section in the respective county, provided such facility has conducted a full schedule of live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required licensed fee, and meets the other requirements of this chapter.

Ch. 2009-170, § 19, Laws of Fla. Sections 4 through 25 of the act would not take effect by their enactment; instead, they would only take effect if specified events in the process of establishing the Seminole Gaming Compact were achieved.[5] These conditions precedent were removed during the next legislative session. Ch. 2010-29, § 4, Laws of Fla.

The 2009 amendment to "eligible facilities" has two clauses, referred to as the "second clause" and "third clause." The former, which was designed to expand the number of facilities in Miami-Dade County beyond those existing at the time, was upheld in Florida Gaming Centers, Inc. v. Florida Department of Business & Professional Regulation, 71 So. 3d 226 (Fla. 1st DCA 2011) (statute allowing holders of pari-mutuel wagering permits in Miami-Dade County to obtain approval

---

[5] The contingencies were met "if the Governor and an authorized representative of the Seminole Tribe of Florida execute an Indian Gaming Compact pursuant to the Indian Gaming Regulatory Act of 1988 and requirements of this act, only if the compact is ratified by the Legislature, and only if the compact is approved or deemed approved, and not voided pursuant to the terms of this act, by the Department of the Interior, and such sections take effect on the date that the approved compact is published in the Federal Register." Ch. 2009-170, § 26, Laws of Fla.

for slot machines in that county did not violate constitutional provision authorizing slot machine gaming in Miami–Dade County; Legislature may expand slot machine gaming beyond the existing facilities provided they meet the specified criteria). The third clause, the one at issue in this litigation, is claimed by Gretna Racing to be the Legislature's expression of authority to allow slot machine referenda in any of the other sixty-five counties where pari-mutuel facilities are currently located;[6] the Department reads its differently, siding with the hearing officer and the Attorney General, who read it to say that the authorization for slot machine referenda does not exist other than in Miami-Dade and Broward Counties.

---

[6] Gretna Racing correctly notes that other than Miami-Dade and Broward Counties, seventeen other counties currently have pari-mutuel facilities thereby making them the only ones eligible for slot machines because statutory locational restrictions prevent new facilities absent legislative action. § 550.054(2), Fla. Stat. (2015). Even so, this potential geographic expansion of slot machines is eyebrow-raising. Using population data (which does not account for tourists), Miami-Dade and Broward currently have about 4,532,109 residents (about 22.8% of the State's overall population). If slot machines were permitted in facilities in these seventeen additional counties, whose populations total 8,590,612 (or about 43.2% of the State's overall population), a tripling of direct access to slot machines (66.0%) would occur; if indirect access is taken into account, by including adjacent counties, the percentage jumps to 96.6%, leaving only ten counties (all rural, totaling only about 3.4% of the State's population) that neither have, nor have a neighboring county with, a pari-mutuel facility. See U.S. Census Bureau, State & County QuickFacts, quickfacts.census.gov/qfd/states/12000.html (last visited July 2, 2015); Pari-Mutual Permitholders with 2014-2015 Operating Licenses (Nov. 24, 2014), http://www.myfloridalicense.com/dbpr/pmw/documents/MAP-Permitholders--WITH--2014-2015-OperatingLicenses--2014-11-24.pdf.

II.

A.

This case has been presented as a statutory interpretation case, but, as an initial matter, it is not at all clear that the Legislature has the constitutional authority to expand the use of slot machines outside of the geographic areas of Broward and Miami-Dade Counties as permitted by article X, section 23. The Florida Supreme Court's decision in Greater Loretta, which has not been overturned, explicitly held that article X, section 7, of the 1968 Constitution, prohibited—as a form of lottery—the use of slot machines anywhere in the State. It is worth repeating: "All other lotteries including bolito, cuba, *slot machines*, etc., were *prohibited*." 234 So. 2d at 672 (emphasis added). Yet the supreme court in Advisory Opinion re: Slot Machines in 2004 stated its belief that its 1930s decisions involving slot machines had settled the question of whether slot machines are lotteries, but it did so without so much as mentioning its directly contrary decision in Greater Loretta; the supreme court is not in the habit of silently overruling its precedents. Puryear v. State, 810 So. 2d 901, 905-06 (Fla. 2002) ("We take this opportunity to expressly state that this Court does not intentionally overrule itself sub silentio."). So which is it? Are slot machines a form of lottery that only the people may approve via constitutional amendment? Or

16

are slot machines not prohibited as lotteries under article X, section 7, which may be legislatively authorized statewide without constitutional authority?

Despite the uncertainty that exists, counsel for Gretna Racing and the Department at oral argument disagreed with the notion that any constitutional limitation exists on the Legislature's authority to expand slot machines statewide; they disagreed only on whether the statute at issue was intended to do so without additional statutory or constitutional authority. Similarly, some argue that this Court has already implicitly held in Florida Gaming Centers that the Legislature is not limited by the anti-lottery provision in article X, section 7, and may expand slot machines statewide if it chose to do so. That case, of course, did not make such a holding, didn't even mention Greater Loretta, and was limited to only whether a facility *in Miami-Dade County* could be legislatively included as an eligible facility for slot machines in that already-approved jurisdiction. 71 So. 3d at 227-29. That the Legislature allowed additional facilities in a county already authorized by article X, section 23, to have slot machines is a far different question than whether the Legislature may allow expansion into any other counties that have not been given constitutional authority to hold slot machine referenda. As such, it appears that a serious unresolved question exists, one upon which this Court need not pass to resolve the specific dispute this case, but one for which a clear resolution is

needed. See generally Shields, supra (discussing the need to address the conflict between Greater Loretta and Advisory Opinion re: Slot Machines).

B.

Bearing in mind the history of the illegality of slot machines in Florida, and keeping the Florida Supreme Court's uncertain jurisprudence about slot machines as lotteries as a backdrop, we turn to the statutory interpretation question at issue: Did the Legislature intend its 2009 amendment to the definition of "eligible facility" in section 551.102(4) to authorize the counties other than Miami-Dade and Broward to hold slot machine referenda in their jurisdictions without the passage of additional authority for such referenda?

The key portion to be interpreted is whether "a majority of voters have approved slot machines at such facilities in a countywide referendum *held pursuant to a statutory or constitutional authorization after the effective date of this section* in the respective county." § 551.102(4), Fla. Stat. (emphasis added). The question is which of two differing interpretations of the italicized phrase should prevail.

Gretna Racing operates a pari-mutuel facility in Gadsden County, which held a "voter's sentiments" election on January 31, 2012, on the topic pursuant to section 125.01(1)(y), Florida Statutes. Gretna Racing reads this phrase as two separate and independent provisions: "*held [1] pursuant to a statutory or*

18

*constitutional authorization [2] after the effective date of this section.*" It reads the latter portion—[2]—to mean that a county is authorized to hold a local vote on slot machine approval "after the effective date" of the statute. Rather than modifying the immediately adjacent word "authorization," it views [2] as modifying the word "held" only, which appears eight words earlier. It reads the former portion—[1]—as meaning that slot machine approval need only be "pursuant to a statutory or constitutional authorization" on the books at the time of the vote. It rejects reading [1] and [2] together as requiring specific or additional statutory or constitutional authorization for county referenda to approve slot machines, such as the authorization given to Miami-Dade and Broward under article X, section 23; instead, a county may hold a slot machine vote under whatever existing general authority it has to submit a votes to the public.

The Department offers a different view, one that is consistent with a plain reading of the statute, the rules of statutory construction, and the history of slot machine legislation in Florida. The Department views the phrase "pursuant to a statutory or constitutional authorization after the effective date of this section" as one continuous, connected union of words that collectively state the authority to which a slot machine referendum must be held. The phrase, in total, directly follows and modifies the words "referendum held" to explain that the "statutory or constitutional authorization" for a referendum on slot machines must be "after the

19

effective date of this section." In other words, the legal "authorization" for such a vote is not already on the books; the authorization must be "after" the section's effective date.

This reading is superior to that posited by Gretna Racing in many ways. First, under a plain reading approach the language at issue is essentially one long adjective modifying "referendum," explaining what authorization is necessary for future county referenda on slot machines. It does not require that the two components of the phrase, [1] and [2], be separated and moved about like refrigerator magnets to restructure and thereby change the meaning of the statute. Under Gretna Racing's reading, the statute would read: "referendum held [2] after the effective date of this section and [1] pursuant to an existing general statutory or constitutional authorization of referenda ~~after the effective date of this section~~." Separating and re-positioning the phrase "after the effective date of this section" to an earlier point changes the statute markedly; detaching the two neighboring words "authorization after" from one another removes the direct temporal connection between them. Read as written by the Legislature, the "statutory or constitutional authorization" for the referenda must have arisen "after the effective date of this section." Moreover, the phrase "referendum held pursuant to *a* statutory or constitutional authorization after the effective date of this section" envisions a separate and distinct *new* basis of authority; if existing referenda powers were

20

enough, the statute need only say "held pursuant to a statutory or constitutional authorization," making the "a" redundant. It is plain that this statute alone does not provide the authorization for statewide slot machine referenda.

This perspective is consistent with the Attorney General's view of the third clause, upon which the hearing officer heavily relied:

> Applying standard rules of statutory and grammatical construction, it is clear that the phrase "after the effective date of this section" modifies the words immediately preceding it, *i.e.*, "a statutory or constitutional authorization." Specifically, under the last antecedent doctrine of statutory interpretation, qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to others more remote, unless a contrary intention appears. Here, all pertinent considerations confirm that the Legislature intended that any statutory or constitutional authorization for a slots-approving referendum must occur after July 1, 2010, the effective date of the relevant portion of section 551.102(4), Florida Statutes.

Op. Att'y Gen. 12-01 (2012) (internal citations and footnotes omitted); see also State v. Fam. Bank of Hallandale, 623 So. 2d 474, 478 (Fla. 1993) ("Although an opinion of the Attorney General is not binding on a court, it is entitled to careful consideration and generally should be regarded as highly persuasive."); Beverly v. Div. of Beverage of Dep't of Bus. Reg., 282 So. 2d 657, 660 (Fla. 1st DCA 1973) (official opinions of the Attorney General, though not binding, are "entitled to great weight in construing the law of this State."). The Attorney General continued, saying:

Similarly, if a county's existing powers were sufficient to authorize a slots-approving referendum, there would be no need to include the phrase "pursuant to a statutory or constitutional authorization." Had the Legislature simply been referring to a county's existing statutory or constitutional authority, the following stricken language could have been omitted without causing any change in the meaning of the statute:

> "any licensed pari-mutuel facility in any other county in which a majority of voters have approved slot machines at such facilities in a countywide referendum held after the effective date of this section in the respective county, provided such facility has conducted a full schedule of live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required licensed fee, and meets the other requirements of this chapter."

Instead, the Legislature chose to mandate that the referendum be held "pursuant to a statutory or constitutional authorization"—an explicit qualifier that appears to be unique in the Florida Statutes. Indeed, no other referendum provision in the Florida Statutes employs similar language. Thus, I cannot conclude that the language "statutory or constitutional authorization" merely recognizes a county's authority in existence as of the effective date of the act. Rather, the Legislature's chosen language requires the adoption of a statute or constitutional amendment specifically authorizing a referendum to approve slot machines.

Op. Att'y Gen. Fla. 12-01 (2012) (footnotes omitted). Her opinion, though not binding, and merely persuasive, is spot on.

The statute need not be rewritten to achieve the Department's view by inserting the word "enacted" between "authorization" and "after" (i.e., "pursuant to

22

statutory or constitutional authorization <u>enacted</u> after the effective date of this section."). While insertion of the word "enacted" may provide a degree of clarity, it is unnecessary. And from a grammatical viewpoint, the statute would need to say "pursuant to <u>a statute</u> ~~statutory~~ or constitutional <u>amendment</u> ~~authorization~~ <u>enacted</u> after the effective date of this section" to be intelligible. Statutes and constitutions can be "enacted"; saying an "authorization" was "enacted" is exceptionally awkward.

Second, the Department's reading is more faithful to the statute's structure and answers the question of what legal authorization is necessary for local slot referenda. Keep in mind that no statutes exist that provide authorization for slot machine approval via county referenda other than those passed to effectuate referenda in Miami-Dade and Broward as constitutionally authorized, <u>see, e.g.</u>, §§ 551.101 (slot machines in Miami-Dade and Broward authorized "provided that a majority of voters in a countywide referendum have approved slot machines at such facility in the respective county.") and .104(2) ("An application may be approved by the division only after the voters of the county where the applicant's facility is located have authorized by referendum slot machines within pari-mutuel facilities in that county as specified in s. 23, Art. X of the State Constitution."). Gretna Racing cannot point to any such authorization; all it relies upon is a generalized "voter sentiment" statute (discussed later) that provides no

23

authorization for approval of any substantive matter of county concern. § 125.01(y), Fla. Stat. Gretna Racing's reading of section 551.102(4) would transform an exceedingly limited authority for county straw polls into a broad authority to expand slot machines statewide, which cannot possibly be what the Legislature intended.

Third, if the Legislature truly intended to immediately expand the authority of counties to hold referenda on slot machines, without future "statutory or constitutional authorization" for such referenda, it assuredly would have amended a critical portion of the slot machine statute, which is the authorization section, entitled "Slot machine gaming authorized." § 551.101, Fla. Stat. That statute, which limits authorized slot machine gaming to Miami-Dade and Broward Counties, was not amended to include any other possibilities.

Fourth, it takes little imagination to envision, particularly in the heat of an internal debate over legislation about the Seminole Tribe gaming compact, that the potential proliferation of slot machines statewide in competition with the Tribe's gaming operations would merit some legislative statement about how local expansion beyond Miami-Dade and Broward might occur. On this point, the Attorney General, recognizing the context in which section 551.102(4) was amended, said:

> [T]he conclusion that additional legislative authorization is required for a slots-approving referendum gives due recognition to the context in which the Legislature adopted the relevant portion of section 551.102(4), Florida Statutes. The language in question took effect as part of legislation ratifying a gaming compact between the State and the Seminole Tribe of Florida, which contained provisions mandating a reduction or loss of revenue to the State in response to an expansion of slot machine gambling beyond that which existed at the time of the compact's adoption. To read the pertinent language in section 551.102(4) as allowing counties other than Miami-Dade and Broward by referendum to authorize slot machines, absent specific legislative or constitutional authority, would be at odds with the legislation as a whole. Specifically, that interpretation of the statute would eliminate the State's control over its continued entitlement to a substantial amount of revenue from the Seminole Tribe. In light of the intense consideration and debate that went into the Legislature's approval of the Seminole compact, it is virtually unthinkable that the Legislature would have intended to both undermine and ratify the compact in the same enactment. The basic canons of statutory interpretation require me to reject a reading of section 551.102(4) that would lead to such an absurd result. [7]

Op. Att'y Gen. Fla. 12-01 (2012). In this context, the third clause is easily seen as a

statement that set the parameters for possible future expansion via county

---

[7] Nine thousand, six hundred voters (33.5% of the 28,684 then-registered in Gadsden County), weighed in on the question, 6,042 favorably. That the sentiments of these 6,042 voters in one of Florida's smaller counties, representing just 0.085% of registered voters statewide at the time, could unilaterally jeopardize the State's receipt annually of hundreds of millions of revenues under the Seminole Tribe compact punctuates how unfathomable such a result would be. See Fla. Dep't of State, Div. of Elections, Voter Registration Year to Date Report: January 2012, available at http://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-monthly-reports/.

referendum, which would require "statutory or constitutional authorization after the effective date of this section." This view of the statute does not render it meaningless or inconsequential. It reflects that the authority to expand slot machines beyond Miami-Dade County must be pursuant to a statutory or constitutional authorization that currently does not exist, which makes sense given the first clause's limitation to Miami-Dade County as well as the doubt that surrounds whether the Legislature has authority to expand slot machines into counties other than Miami-Dade and Broward without a constitutional amendment like article X, section 23. Nothing prohibits legislation that has a contingency that makes a statute effective only upon some triggering event (such as possible future authorization of slot machines on a local basis via referendum). And nothing prohibits the Legislature from enacting a statute that operates as a restraint on society with a stated understanding about how that restraint might be eliminated in the future. Not all statutes are blossoms; some are only seeds. One need look no further than our state constitution, which has a provision allowing for the legislature to pass a special law without notice to an affected community that "is *conditioned to become effective only upon approval by vote of the electors of the area affected*." Art. III, § 10, Fla. Const. (emphasis added). By analogy, the enactment of the third clause in 551.102 was the legislature acting in anticipation of a contingency.

26

Fifth, to the extent one sees an ambiguity in the statute, the legislative history, exceptionally limited as it is (nothing written, only comments by legislators during a floor debate), is helpful. The Attorney General's opinion is again persuasive on this point:

> Legislative intent, the cornerstone of all statutory interpretation, may be illuminated by the comments of the sponsor or proponents of a bill or amendment. The Senate bill sponsor, Senator Dennis Jones, gave the following explanation on second reading of the 2010 legislation in response to a question about the local referendum process for a county that wants to add slot machine gaming and how that process would work:
>
> > "Should we want to expand in the future, a Legislature would come back and . . . let's just say we wanted to go to Class III slots, we could not do that as a local bill but we could come up here and file it as a general bill and should that bill pass to allow [a county] to have a referendum of the people and then the people vote on it, if it was passed, we could get Class III slots but it [would] also break the compact with the Indians."
>
> In further clarification, Senator Jones stated:
>
> > "If they have a referendum in a county outside of Miami-Dade and Broward for the purpose of Class III gaming *and the Legislature passes the legislation to allow that county to have the referendum*, the county has the referendum and that referendum passes, then that would effectively break the payments of the compact." (e.s.)
>
> The above explanation by a sponsor of the legislation clearly indicates that, under the pertinent language in section 551.102(4), Florida Statutes, a county referendum to approve slots must be specifically

27

authorized by a statute or constitutional amendment enacted after July 1, 2010. Such an explanation is contrary to any assertion that the Legislature intended the provisions of section 551.102(4), in conjunction with a county's already-existing powers, to constitute authority for a county to hold a referendum on slot machine gaming.

Op. Att'y Gen. Fla. 12-01 (2012) (footnotes omitted). What's more, Gretna Racing seeks an exception to the long-standing prohibition against slot machines, the possession and use of which are criminal acts absent clear authorization, which is why the statute at issue is strictly construed as opposed to expansively interpreted. PPI, Inc. v. Dep't of Bus. & Prof'l Reg., Div. of Pari-Mutuel Wagering, 698 So. 2d 306, 308 (Fla. 3d DCA 1997) ("The penny-ante statute is an exception to long-standing Florida law that prohibits all such forms of gambling; as such, it is to be strictly construed."); State v. Nourse, 340 So. 2d 966, 969 (Fla. 3d DCA 1976) ("Being an exception to a general prohibition, any such statutory provision is normally construed strictly against the one who attempts to take advantage of the exception.").

In sum, little commends the reading that Gretna Racing places on section 551.104(2), and essentially every meaningful means of statutory interpretation favor the Department's view, which is itself accorded great weight. Orange Park Kennel Club, Inc. v. State, Dep't of Bus. & Prof'l Reg., 644 So. 2d 574, 576 (Fla. 1st DCA 1994) ("An agency's construction of a statute which it administers is entitled to great weight and will not be overturned unless the agency's

28

interpretation is clearly erroneous; the agency's interpretation need not be the sole possible interpretation or even the most desirable one; it need only be within the range of possible interpretations."). For these reasons, the denial of Gretna Racing's request for a slot machine license was proper.

C.

Finally, even if the statute could be read as Gretna Racing suggests, the Gadsden County vote was neither a "referendum" nor did it provide voter approval as section 551.104(2) requires, which states that a "majority of voters have *approved* slot machines at such facilities in a countywide *referendum*" to be eligible. (Emphasis added). The state constitution provides that "Special elections and referenda shall be held as provided by law." Art. VI, § 5, Fla. Const. The phrase "as provided by law" means an act passed by the Legislature. Holzendorf v. Bell, 606 So. 2d 645, 648 (Fla. 1st DCA 1992).

The sole statutory authorization the County relied upon for holding a "referenda" on slot machines, section 125.01(1)(y), Florida Statutes, neither provides for a "referendum" nor does it permit voter approval of any substantive matters. It states in relevant part:

> (1) The legislative and governing body of a county shall have the power to carry on county government. To the extent not inconsistent with general or special law, this power includes, but is not restricted to, the power to:
> . . .

29

(y) *Place questions or propositions on the ballot* at any primary election, general election, or otherwise called special election, when agreed to by a majority vote of the total membership of the legislative and governing body, *so as to obtain an expression of elector sentiment with respect to matters of substantial concern within the county*. No special election may be called for the purpose of conducting a straw ballot.

§ 125.01(1)(y), Fla. Stat. (emphasis added). Rather than allowing for voter *approval* on a substantive matter, which is the essence of a referendum, see 5 McQuillin Mun. Corp. § 16:51 (3d ed.) ("Referendum is the right of people to have an act passed by the legislative body submitted for their approval or rejection.") (footnote omitted), section 125.01(1)(y) merely allows for voters to express their *sentiments* on a matter. Voter sentiment falls short of voter approval; sentiment is mere opinion akin to a straw vote that is non-binding; approval is authorization, which is binding. City of Miami v. Staats, 919 So. 2d 485, 487 (Fla. 3d DCA 2005) (non-binding straw ballot defective because "it fails to adequately inform the voting public that their response has no official effect, i.e., that the ballot question is simply a nonbinding opinion poll."); 5 McQuillin Mun. Corp. § 16:51 (3d ed.) ("Ordinarily, 'referendum' does not include nonbinding public questions.") (footnote omitted). At most, the County could only have put to the voters the non-binding question of whether they are supportive of slot machines in the Gretna Racing facility. City of Hialeah v. Delgado, 963 So. 2d 754, 757 (Fla. 3d DCA

30

2007). And to the extent the County's vote under section 125.01(1)(y) is portrayed as a binding "referendum," it was not; it could not have been absent statutory or constitutional authorization giving the County referendum powers. As we said in Holzendorf, "Since the constitution expressly provides that the power of referendum can be granted only by the legislature, it is beyond the power of the electorate to say what shall or shall not be done by referendum." Id. The administrative order, even if incorrect in its construction of section 551.102(4) is nevertheless legally correct. Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 645 (Fla. 1999) (appellate court not limited to "reasons given by the trial court but rather must affirm the judgment if it is legally correct regardless of those reasons").

### III.

The Department's interpretation of the third clause in section 551.102(4) is an entirely reasonable one. The alternative view, which would restructure the statute and change its meaning to allow slot machines to be deployed on a statewide basis without any clear authority to do so, is inconsistent with principles of statutory and constitutional construction, legislative intent, and the history of laws prohibiting slot machines in the State of Florida. Because the issue presented is one of great public importance statewide, the following certified question is appropriate:

31

> Whether the Legislature intended that the third clause of section 551.102(4), Florida Statutes, enacted in 2009, authorize expansion of slot machines beyond Miami-Dade and Broward Counties via local referendum in all other eligible Florida counties without additional statutory or constitutional authorization after the effective date of the act?

Should our supreme court choose to review this question, consideration should also be given to resolution of the Legislature's authority under the 1968 Constitution to authorize slot machines at pari-mutuel facilities in counties other than Miami-Dade or Broward, whose authority arises from article X, section 23. Puryear v. State, 810 So. 2d 901, 905-06 (Fla. 2002) ("Where this Court's decisions create this type of disharmony within the case law, the district courts may utilize their authority to certify a question of great public importance to grant this Court jurisdiction to settle the law."); Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So. 2d 911, 912 (Fla. 1995) ("Having accepted jurisdiction, we may review the district court's decision for any error.").

AFFIRMED.

BILBREY, J., CONCURRING IN PART and IN RESULT WITH OPINION; BENTON, J., DISSENTING WITH OPINION.

32

BILBREY, J., concurring in part and in result.

Following the retirement of the Honorable Nikki Clark from this Court the "luck of the draw"[8] has placed me on the three judge panel assigned to consider the motion for rehearing. While there is no clear guidance on the appropriate standard the successor judge is to apply when passing on a motion for rehearing, my decision to grant rehearing is based on the following considerations.

Certainly, the judgment of a retired colleague is entitled to some deference. In considering the authority of a successor trial judge, the Florida Supreme Court has stated:

> While a judge should hesitate to undo his own work, and should hesitate still more to undo the work of another judge, he does have, until final judgment, the power to do so and may therefore vacate or modify the Interlocutory rulings or orders of his predecessor in the case. This 'code' of restraint is not based solely on the law of the case but is founded upon considerations of comity and courtesy.

Tingle v. Dade County Bd. of County Com'rs, 245 So. 2d 76, 78 (Fla. 1971).[9] I believe such a code of restraint applies to an appellate judge as well. Nevertheless, only deference is required, and a successor judge is not required to always vote identically to the predecessor on rehearing. "Nor is the Court, to borrow a famous

---

[8] See In re Doe 13-A, 136 So. 3d 748, 756 (Fla. 1st DCA 2014) (Swanson, J., dissenting on denial of rehearing en banc).

[9] At the appellate level a case is not final until the mandate issues. Washington v. State, 637 So. 2d 296 (Fla. 1994). The mandate has not issued here, and the motion for rehearing was timely filed.

phrase, a potted plant." <u>United States v. HSBC Bank USA, N.A.</u>, 2013 WL 3306161, *5 (E.D. N.Y. 2013) (citation omitted).  After all, it is not uncommon for any judge to change his or her mind when faced with a motion for rehearing.[10]

Given that I believe that a successor judge has some discretion in considering a motion for rehearing, but should be hesitant to do so, the next issue is the appropriate standard any judge should apply to such a motion.  Rule 9.330(a), Florida Rules of Appellate Procedure, provides in part, "[a] motion for rehearing shall state with particularity the points of law or fact that, in the opinion of the movant, the court has overlooked or misapprehended in its decision." Furthermore, "[a] motion for rehearing must address some error or omission in the resolution of an issue previously presented in the main argument."  Phillip J. Padovano, <u>Florida Appellate Practice</u> § 21:2 (2015).

It is clear that the original panel decision did not overlook any points of law or fact.  Judge Benton's detailed, original majority decision squarely addressed all

---

[10]I have been in the position of successor judge on a motion for rehearing on many occasions in my brief time on this Court, and although I may have decided some of those cases differently had I been on the original panel, until today I only thought that rehearing was appropriate in one case.  <u>See</u> <u>Morales v. State</u>, -- So. 3d --, 40 Fla. Law Weekly D1219 (Fla. 1st DCA May 22, 2015) (Bilbrey, J., concurring).  I believe consideration can be given to whether the original decision was a substantial departure from established law and how important the issue was which the original panel decided.  I also think that the decision of a supermajority of this Court to abate the vote on whether to grant en banc review pending a decision on the motion for rehearing, shows that my colleagues believe I have some level of autonomy in considering the motion.

of the issues which the parties raised. The other basis then to grant rehearing would be if the original decision misapprehended some point of law or fact.[11] This provision of rule 9.330(a) gives me greater leeway and greater comfort in agreeing that it is appropriate to grant rehearing.

I respectfully disagree with Judge's Benton's reading of section 551.102(4), Florida Statutes. More particularly, I conclude that he has misapprehended the third clause of the statute which defines an eligible facility. I find Judge Makar's discussion of the plain reading approach and the last antecedent doctrine in section II. B. particularly persuasive. "In construing a statute, we look first to the statute's plain meaning." Moonlit Waters Apts., Inc. v. Cauley, 666 So. 2d 898, 900 (Fla. 1996). "[R]elative and qualifying words, phrases and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to, or including, others more remote." City of St. Petersburg v. Nasworthy, 751 So. 2d 772, 774 (Fla. 1st DCA 2000).[12] Plainly, the "after the

---

[11] "Misapprehend" or "misapprehended" is not defined the Florida Rules of Appellate Procedure or in *Black's Law Dictionary.* "Misapprehend" is defined by the *Oxford English Dictionary* (2nd ed. 1989) as "to apprehend wrongly; not to understand rightly; to attach a wrong meaning to." The Merriam-Webster Online Dictionary defines misapprehend as "to apprehend wrongly: misunderstand." Merriam-Webster, http://www.merriam-webster.com (last visited August 13, 2015).

[12] The best argument for Judge Benton's reading of the statute is his observation that the third clause of section of section 551.102(4) is rendered meaningless if read in the manner suggested by the Department. Perhaps, however, the

effective date of this section" language in section 551.102(4) modifies the immediately preceding "a statutory or constitutional authorization" phrase, and not the more remote "referendum held" phrase.

The misapprehension in the original decision as what qualifies as an "eligible facility" is very significant. As noted in footnote 6 of Judge Makar's opinion, if the original decision were to stand, seventeen Florida Counties would be eligible to conduct referenda on slot machine expansion and potentially allow slot machines in contravention of the will of the Florida Legislature as expressed by the Seminole Compact. Rehearing is therefore necessary to address this misapprehension.

---

Legislature included the third clause in order to prevent the statute being deemed a special law, which is prohibited by article III, section 10 of the Florida Constitution. See Dep't of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass'n., Inc., 967 So. 2d 802 (Fla. 2007) (explaining a statute is unconstitutional, as a special law, if it is a law which relates to or operates upon particular persons or things); Dep't of Bus. Regulation v. Classic Mile, Inc., 541 So. 2d 1155 (Fla. 1989). When the third clause was enacted, the second clause was also enacted. Ch. 2009-170, §19, Laws of Fla. Without the third clause, section 551.102(4) would have no potential state-wide application beyond Miami-Dade and Broward counties. Furthermore, Judge Benton's reading of the third clause is inconsistent with entire Seminole Compact authorization also contained in Chapter 2009-170, Laws of Florida, which offered to grant the Seminole Tribe of Florida exclusivity over all slot machines outside of Miami-Dade and Broward Counties. Why would the Legislature offer the Seminole Tribe exclusivity over slot machines while at the same time authorizing up to seventeen Florida Counties the ability to intrude on this exclusivity? By my reading of section 551.104(4), it did not.

I therefore fully concur in those parts of Judge Makar's opinion regarding the interpretation of section 551.102(4), Florida Statutes. Specifically, I join in sections I. D., II. B., II. C., and III. I also concur in the result which Judge Makar reaches, and with the certified question.

While I agree that the *dicta* in Greater Loretta Improvement Ass'n. v. State ex rel. Boone, 234 So. 2d 665, 671-72 (Fla. 1970), unnecessarily calls into question the ability of the Legislature to regulate slot machines, I also agree with Judge Benton that the settled state of the law in Florida is that slot machines are not lotteries and therefore may be regulated (and legalized) by the Legislature without running afoul of article X, section 7 of the Florida Constitution. See Advisory Op. to the Att'y Gen. re Authorizes Miami-Dade and Broward County Voters to Approve Slot Machines in Parimutuel Facilities, 880 So. 2d 522 (Fla. 2004) (citing Lee v. City of Miami, 121 Fla. 93, 163 So. 486, 490 (1935)); see also Florida Gaming Centers, Inc. v. Florida Dept. of Bus. and Prof'l. Regulation, 71 So. 3d 226 (Fla. 1st DCA 2011). Because I read Judge Makar's decision as not being predicated on this constitutional issue, I find it unnecessary to dissent in part.

BENTON, J., dissenting.

I would reverse the Department's order denying the application Gretna Racing, LLC (Gretna Racing) filed—after a majority in Gadsden County had voted "Yes" in a referendum on the question "Shall slot machines be approved for use at the pari-mutuel horsetrack facility in Gretna, FL?"—for a license to conduct slot machine gaming at its horsetrack facility in Gretna.

The Gadsden County Commission is but one of a half dozen county commissions who voted to put slot machine referenda on ballots in reliance on statutory language they read to render eligible for slot machine licenses

> any licensed pari-mutuel facility in any other [than Miami-Dade or Broward] county in which a majority of voters have approved slot machines at such facilities in a countywide referendum held pursuant to a statutory or constitutional authorization after the effective date of this section . . . .

Ch. 2009–170, § 19, at 1792, Laws of Fla. (2009). At issue is whether the local officials' reading of the statutory language—which is also Gretna Racing's—is correct. This question of statutory interpretation—not any constitutional or policy issue—lies at the heart of the present case.

The Department maintains that it "'is not authorized to issue a slot machine license to a pari-mutuel facility in a county which . . . holds a countywide

38

referendum to approve such machines, absent a statutory or constitutional provision enacted after July 1, 2010, authorizing such referendum.'"  Answer Brief at pp. 4-5 (emphasis added; citation omitted).  But section 551.102(4), Florida Statutes (2006), does not contain the word "enacted."  "'Usually, the courts in construing a statute may not insert words or phrases in that statute or supply an omission that to all appearances was not in the minds of the legislators when the law was enacted. When there is doubt as to the legislative intent, the doubt should be resolved against the power of the court to supply missing words.'"  Special Disability Trust Fund, Dep't of Labor & Emp't Sec. v. Motor & Compressor Co., 446 So. 2d 224, 226 (Fla. 1st DCA 1984) (quoting Rebich v. Burdine's, 417 So. 2d 284, 285 (Fla. 1st DCA 1982) (internal citation omitted)).  Inserting the word "enacted" also strips the quoted statutory language of any legal effect.[13]

---

[13] See Butler v. State, 838 So. 2d 554, 555-56 (Fla. 2003) ("Because the Legislature does not intend to enact purposeless or useless laws, the primary rule of statutory interpretation is to harmonize related statutes so that each is given effect." (citation omitted)); Sharer v. Hotel Corp. of Am., 144 So. 2d 813, 817 (Fla. 1962) ("It should never be presumed that the legislature intended to enact purposeless and therefore useless, legislation.  Legislators are not children who build block playhouses for the purpose, and with the gleeful anticipation, of knocking them down.  It would be the heighth [sic] of absurdity to assume that the legislature intentionally prescribed a formula which creates the need for a Special Disability Fund, and in the next breath deviously destroyed its own handiwork— thus making a mockery of the intended beneficent purpose of the Special Disability Fund itself. . . .  We cannot be persuaded that a majority of the legislators designedly used an indirect, unusual and abnormal procedure.  It suggests either inadvertence or cabal." (footnote omitted)).

Under the Department's construction of the third clause of section 551.102(4), a referendum could only occur if another statute (or a constitutional amendment) was enacted (or adopted) authorizing a referendum. But that was the status quo before section 551.102(4) was amended (or, indeed, enacted). It goes without saying that the Legislature could enact or amend a statute, or that the people could adopt a constitutional amendment, authorizing a referendum. That was true before chapter 2009-170, section 19, was enacted, and remains true after the enactment. There was no need or purpose in enacting a statutory provision to state the obvious. "We have recognized that 'the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render [any] part of a statute meaningless.' State v. Goode, 830 So. 2d 817, 824 (Fla. 2002); see also Martinez v. State, 981 So. 2d 449, 452 (Fla. 2008) (repeating this quote). '[W]ords in a statute are not to be construed as superfluous if a reasonable construction exists that gives effect to all words.' State v. Bodden, 877 So. 2d 680, 686 (Fla.2004)." Metro. Cas. Ins. Co. v. Tepper, 2 So. 3d 209, 215 (Fla. 2009). We should decline the invitation to interpret the third clause in a way that would render the clause perfectly meaningless, nugatory and without any legal effect.

The Legislature has plenary authority over slot machines, authority the parties themselves do not question here. At oral argument, the assistant attorney general representing the Department conceded that the Florida Constitution does

40

not restrict the Legislature's authority to allow slot machines (as opposed to lotteries). While Judge Makar's opinion goes on at some length about our supreme court's jurisprudence in this area, making much of dicta in Greater Loretta Improvement Association v. State ex rel. Boone, 234 So. 2d 665, 671–72 (Fla. 1970), it acknowledges that the last word from the Florida Supreme Court came in Advisory Opinion to the Attorney General Re: Authorizes Miami–Dade and Broward County Voters to Approve Slot Machines in Parimutuel Facilities, 880 So. 2d 522, 525 (Fla. 2004), where the court actually held:

> We have long since settled the question of whether slot machines constitute lotteries. In Lee v. City of Miami, 121 Fla. 93, 163 So. 486, 490 (1935), we addressed the question of whether certain legislatively described gambling machines, such as slot machines, constituted lotteries prohibited by the state constitution. We concluded they did not.

"The Constitution of Florida is a limitation of power, and, while the Legislature cannot legalize any gambling device that would in effect amount to a lottery [other than state operated lotteries authorized by article X, section 15 of the Florida Constitution], it has inherent power to regulate [or not] or to prohibit [or not] any and all other forms of gambling." Lee, 163 So. at 490. Accord Hialeah Race Course, Inc. v. Gulfstream Park Racing Ass'n, 37 So. 2d 692, 694 (Fla. 1948) ("Authorized gambling is a matter over which the state may . . . exercise its police

41

power . . . ."). Any implication that a constitutional amendment was or is necessary to allow slot machines by general law is unwarranted.[14]

But, the broad reach of legislative authority over slot machines and pari-mutuel wagering notwithstanding, the Legislature is subject, in this area, too, to constitutional restrictions on special laws and general laws of local application.[15]

---

[14] See Pasternack v. Bennett, 190 So. 56, 57 (Fla. 1939) ("[I]t is . . . settled in this jurisdiction that those devices commonly known as slot machines are gambling devices . . . subject to the police power of the State to regulate, control, prohibit or destroy them."); Eccles v. Stone, 183 So. 628, 631-32 (Fla. 1938) (recounting that the Legislature legalized the operation of slot machines in 1935, then prohibited the operation of coin-operated gambling devices in 1937, and that the "state policy has for many years been against all forms of gambling, with the exception of the legislative enactment legalizing parimutuel wagers on horse racing and the 1935 Act legalizing the operation of slot machines"); Fla. Gaming Ctrs., Inc. v. Fla. Dep't of Bus. & Prof'l Regulation, 71 So. 3d 226, 229 (Fla. 1st DCA 2011) ("The Legislature has broad discretion in regulating and controlling pari-mutuel wagering and gambling . . . .").

[15] Compare, e.g., Fla. Dep't of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass'n, 967 So. 2d 802, 809 (Fla. 2007) (holding a statute regulating live broadcasts of horse races was unconstitutional as a special law, albeit enacted in the guise of a general law, without compliance with the requirements for the enactment of special laws because the conditions making the provision applicable "existed only in the area where Gulfstream was located, and there was no reasonable possibility that they would ever exist in another part of the state"); Dep't of Bus. Regulation v. Classic Mile, Inc., 541 So. 2d 1155, 1158–59 (Fla. 1989) (holding statute regarding thoroughbred horse racing was unconstitutional as a special law in the guise of a general law because Marion County was the sole county that would ever fall within the statutorily designated class of counties eligible for licensure; rejecting argument that "the regulatory responsibilities given to the state under the statute [were] part of the overall statewide regulatory scheme

Constitutional restrictions on special laws and general laws of local application may help explain resort to the ballot initiative that resulted in article X, section 23, authorizing slot machines at certain (not all) pari-mutuel facilities in Miami-Dade and Broward Counties, but not elsewhere.

Article X, section 23 does not apply to Hialeah Race Track. Even though located in Miami-Dade County, Hialeah Race Track does not and could not qualify

---

for the parimutuel industry, thereby rendering the statute a general law"; and rejecting argument that the statewide impact of revenue that might be generated as a result of the statute rendered the statute a general law); Ocala Breeders' Sales Co. v. Fla. Gaming Ctrs., Inc., 731 So. 2d 21, 24–25 (Fla. 1st DCA 1999) (holding statute that enabled one thoroughbred horse breeder operating within the state to obtain an exclusive license to conduct pari-mutuel wagering at its sales facility was an unconstitutional special law enacted in the guise of a general law), aff'd, 793 So. 2d 899 (Fla. 2001), with, e.g., License Acquisitions, LLC v. Debary Real Estate Holdings, LLC, 155 So. 3d 1137, 1142, 1147 (Fla. 2014) (holding a statute that authorized a jai alai facility to convert to a dog track under certain circumstances was a valid general law "because there is a reasonable possibility that it could apply to ten of the eleven jai alai permits in the state" and rejecting an interpretation of the statute that would render it an unconstitutional special law). See also Dep't of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So. 2d 879, 882–83 (Fla. 1983) (concluding that legislation that, once passed, benefited only a track in Seminole County, was a valid general law because the statute could be applied to tracks that might be built in the future); Biscayne Kennel Club, Inc. v. Fla. State Racing Comm'n, 165 So. 2d 762, 763–64 (Fla. 1964) (holding statute regulating privilege of conducting harness racing was valid general act of uniform operation because "all of the classifications effected by th[e] act are made on the basis of factors which are potentially applicable to others" because "a number of Florida counties may by future referendum acquire racing establishments . . . within the class covered").

43

for licensure pursuant to section 551.104(2) (or the first clause of section 551.102(4)) because live racing or games did not occur there in "each of the last two calendar years before" article X, section 23 was adopted. The parties stipulated in the proceedings below that "Hialeah's application [which the Department granted after the statutory amendment at issue here] was submitted under the second (2nd) clause of § 551.102(4), F.S., enacted effective 7/1/10," not under section 551.104(2). Properly read, the second clause, like the third clause on which Gretna Racing relies, expands the universe of eligible facilities beyond the initial seven addressed in article X, section 23 and section 551.104(2). Hialeah Race Track, like Gretna Racing's horsetrack facility, was not among the initial seven facilities.

Summarizing the 2009 amendment to section 551.102(4), the title to Chapter 2009-170 described its effect as: "amending s. 551.102, F.S.; redefining the terms 'eligible facility' and 'progressive system' to include licensed facilities in other jurisdictions," not just in Miami-Dade or Broward. Ch. 2009-170, at 1749, Laws of Fla. This description of the amendment makes clear its purpose to redefine eligible facilities, not merely to lay the (wholly unnecessary) groundwork for a subsequent statute or constitutional amendment to redefine terms.

By making the amendment to section 551.102(4) applicable, not to Hialeah

44

Race Track only, but statewide ("in any other county") the drafters minimized—or greatly reduced—the possibility that the amendment would be deemed unconstitutional as a general law of local application (or a special law for the benefit of the Hialeah Race Track). This was understandably a matter of concern: Experience has taught that Hialeah Race Track's competitors are a litigious lot.

In response to enactment of this statutory amendment, indeed, perhaps to prevent slot machine competition from the Hialeah Race Track,[16] holders of pari-mutuel wagering permits in Miami–Dade County who were already licensed to install slot machines sought a declaratory judgment that the 2009 amendment to section 551.102(4) at issue here was unconstitutional in its entirety. See Fla. Gaming Ctrs., Inc. v. Fla. Dep't of Bus. & Prof'l Regulation, 71 So. 3d 226, 228 (Fla. 1st DCA 2011). They argued that article X, section 23 of the Florida Constitution limited legislative power to authorize slot machine gaming, by implication, to licensed pari-mutuel facilities in Miami–Dade and Broward

---

[16] Subsequent to the decision in Florida Gaming Centers, Inc. v. Florida Department of Business & Professional Regulation, 71 So. 3d 226 (Fla. 1st DCA 2011), South Florida Racing Association, LLC, owner of Hialeah Race Track, filed an application for a license to conduct slot machine gaming at the Hialeah Race Track in Miami-Dade County. Before the 2009 amendment to section 551.102(4), Hialeah Race Track was ineligible for such a license. It was not among the seven facilities authorized by the 2004 constitutional amendment to be licensed to conduct slot machine gaming because "live racing or games" did not take place at Hialeah Race Track "during each of the last two calendar years before the effective date of t[he] amendment." Art. X, § 23, Fla. Const.

Counties that had conducted live racing or games during calendar years 2002 and 2003. Id. (The Hialeah Race Track conducted racing during the two years before it applied for a slot machine license, but not in 2002 and 2003, i.e., not "during each of the last two calendar years before the effective date of" article X, section 23.)

The incumbent licensees' argument was rejected by each court that considered it. We affirmed summary judgment upholding the constitutionality of section 19 of chapter 2009-170, Laws of Florida, the 2009 amendment to section 551.102, and said: "[T]he only thing that Article X, section 23 limited was the Legislature's authority to prohibit slot machine gaming in certain facilities in the two counties. Contrary to Appellants' position, Article X, section 23 provides no indication that Florida voters intended to forever prohibit the Legislature from exercising its authority to expand slot machine gaming beyond those facilities in Miami–Dade and Broward Counties meeting the specified criteria. Nor is there any indication that Florida voters intended to grant the seven entities who met the criteria a constitutionally-protected monopoly over slot machine gaming in the state." Id. at 229 (citation omitted). The Supreme Court of Florida denied review. Fla. Gaming Ctrs., Inc. v. Fla. Dep't of Bus. & Prof'l Regulation, 90 So. 3d 271 (Fla. 2012).

Against this background,[17] the question before us remains a question of statutory interpretation, and depends ultimately on the amendment's wording.[18]

---

[17] The Legislature, which was negotiating a (now expired) gaming compact with the Seminole Tribe of Florida during the 2009 session, provided that the statutory amendment before us in the present case would "take effect on the date the approved compact is published in the Federal Register," Ch. 2009-170, § 26, at 1803, Laws of Fla., if at all. Uncertainty about the gaming compact and the prospect of a possibly prolonged period before the provision would take effect fully explain why the Legislature required that authorizing referenda occur only after the effective date of the amendment.

The argument that a proliferation of slot machines "would be at odds with the legislation as a whole," Op. Atty. Gen. Fla. 2012-01 (2012), because it could diminish revenue for the Seminole Tribe of Florida applies with equal force to the immediately preceding clause authorizing slot machines at Hialeah Race Track. The bill that became Chapter 2009-170 was apparently "the only train moving" in the 2009 legislative session.

[18] Given the language of the statute, there is no occasion for any extratextual quest for legislative intent. In any event, the majority's resort to a single legislator's views expressed after the legislation was enacted is inappropriate and unpersuasive. It amounts to "oxymoronic 'subsequent legislative history'" that can "add nothing." Walsh v. Brady, 927 F.2d 1229, 1233 n.2 (D.C. Cir. 1991). "[E]fforts by individual members of Congress or congressional committees to state retrospectively the earlier intention of the Congress as a legislative body do not suffice to interpret the meaning of a statute formally enacted by an earlier Congress." U.S. v. City of Miami, Fla., 664 F.2d 435, 437 n.1 (5th Cir. 1981).

The rule in Florida state courts to the same effect is also clear. See Sec. Feed & Seed Co. v. Lee, 189 So. 869, 870 (Fla. 1939) ("We do not overlook the support given appellants' contention by affidavits of members of the Senate as to what they intended to accomplish by the act brought in question. The law appears settled that such testimony is of doubtful verity if at all admissible to show what was intended by the Act."); State v. Patterson, 694 So. 2d 55, 58 n.3 (Fla. 5th DCA 1997) ("The State correctly concedes that the testimony provided by former Representative Glickman did not shed meaningful light on the legislature's intent

47

The language in contention does not reflect any "special agency expertise," and the

in amending section 415.512. As stated in Security Feed & Seed Co. v. Lee, 138 Fla. 592, 189 So. 869 (1939), the testimony of individual members of the legislature as to what they intended to accomplish is of doubtful worth in determining legislative intent and may not even be admissible."); McLellan v. State Farm Mut. Auto. Ins. Co., 366 So. 2d 811, 813 (Fla. 4th DCA 1979) (stating affidavit of legislator stating his view of legislative intent is "generally not accepted as admissible evidence to demonstrate legislative intent"), disapproved on other grounds, S.C. Ins. Co. v. Kokay, 398 So. 2d 1355 (Fla. 1981).

As the court did in Michigan United Conservation Clubs v. Lujan, 949 F.2d 202, 209 (6th Cir. 1991), we should "decline to give significance to sponsors' private thoughts expressed subsequent to the enactment of a bill or an amendment." See also Am. Constitutional Party v. Munro, 650 F.2d 184, 188 (9th Cir.1981) ("As a member of the Conference Committee which drafted the legislation, Representative Nelson's statement might be entitled to some weight if it had been made contemporaneously with the passage of the legislation. Coming one year later, it is entitled to no weight and cannot be relied on as indicative of legislative motivation or intent."); Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 1080 (5th Cir. 1980) ("The retroactive wisdom provided by the subsequent speech of a member of Congress stating that yesterday we meant something that we did not say is an ephemeral guide to history. Though even God cannot alter the past, historians can, Compare Samuel Butler, Creation Revisited, c. 14, and other mortals are not free from the temptation to endow yesterday with the wisdom found today. What happened after a statute was enacted may be history and it may come from members of the Congress, but it is not part of the legislative history of the original enactment."); 2A Norman Singer & Shambie Singer, Sutherland Statutes & Statutory Construction § 48.16 (7th ed. 2007) ("A corollary to the general rule against the use of statements by individual legislators made during debate on a bill directs courts not to consider testimony about legislative intent by members of the legislature which enacted a statute. Courts probably want to avoid issues relating to the credibility of legislators and ex-legislators, in addition to the reasons to avoid an individual legislator's statements about legislative intent. Postenactment statements made by a legislator about legislative intent, including affidavits, are not part of the original enactment's legislative history."(footnotes omitted)).

Department does not maintain that any special agency expertise it may have in the area of pari-mutuel wagering or gaming supports its construction. See State, Dep't of Ins. v. Ins. Servs. Office, 434 So. 2d 908, 912 n.6 (Fla. 1st DCA 1983) ("[B]y urging a construction of these terms based upon their common, ordinary meanings, the Department disavows the utilization of any special 'agency expertise' in its interpretation of the statute. This mitigates, if it does not entirely eliminate, the rule calling upon the court to accord 'great deference' to the agency's interpretation of the statute."). See also Schoettle v. State, Dep't of Admin., Div. of Ret., 513 So. 2d 1299, 1301 (Fla. 1st DCA 1987) (same). The Department explicitly relies, not on any purported agency expertise, but on an Attorney General's Opinion.[19]

---

[19] "Attorney General opinions do not, of course, have binding effect in court. See Abreau v. Cobb, 670 So. 2d 1010, 1012 (Fla. 3d DCA 1996); Johnson v. Lincoln Square Props., Inc., 571 So. 2d 541, 543 (Fla. 2d DCA 1990); Causeway Lumber Co. v. Lewis, 410 So. 2d 511, 515 (Fla. 4th DCA 1981)." Edney v. State, 3 So. 3d 1281, 1284 (Fla. 1st DCA 2009). See also Bunkley v. State, 882 So. 2d 890, 897 (Fla. 2004) (recognizing that "opinions of the Attorney General are not statements of law"); State v. Family Bank of Hallandale, 623 So. 2d 474, 478 (Fla. 1993) ("The official opinions of the Attorney General, the chief law officer of the state, are guides for state executive and administrative officers in performing their official duties until superseded by judicial decision."); Comm'n on Ethics v. Sullivan, 489 So. 2d 10, 13 (Fla. 1986) (noting that although the attorney general has the ability pursuant to section 16.01(3), Florida Statutes, to issue advisory opinions, "such power alone, and without any other constitutional demand, would not make the attorney general a part of the judicial branch"); Browning v. Fla. Prosecuting Attorneys Ass'n., 56 So. 3d 873, 876 n.2 (Fla. 1st DCA 2011)

("Attorney General opinions are not binding on Florida courts and can be rejected."); Ocala Breeder Sales Co. v. Div. of Pari–Mutuel Wagering, Dep't of Bus. Regulation, 464 So. 2d 1272, 1274 (Fla. 1st DCA 1985) ("Our holding is contrary to the cited opinion of the attorney general, but that opinion is not binding upon the court.").

In anticipation of applications like Gretna Racing's, the Department posed the following question to the Attorney General: "Does the third clause of section 551.102(4), Florida Statutes, . . . permit the Department to grant a slot machine license to a pari-mutuel facility in a county which holds a countywide referendum to approve such machines, absent a statutory or constitutional provision enacted after July 1, 2010, authorizing such referendum?" Op. Att'y Gen. Fla. 2012–01 (2012). On January 12, 2012, the Attorney General opined the Department was not authorized to issue a slot machine license pursuant to the third clause of section 551.102(4) "absent a statutory or constitutional provision enacted after July 1, 2010" because the governing clause "contemplates the necessity of additional statutory or constitutional authorization before such a referendum may be held." Id.

Attorney General Opinion 2012–01, on which the Department relied, given in response to a letter in which Department Secretary Lawson requested the Attorney General's views, states in part:

> Section 551.104(1), Florida Statutes, provides in pertinent part that the Division "may issue a license to conduct slot machine gaming in the designated slot machine gaming area of the eligible facility." (e.s.) The term "eligible facility" is defined for purposes of your inquiry to mean:
>
>> "any licensed pari-mutuel facility in any other county in which a majority of voters have approved slot machines at such facilities in a countywide referendum held pursuant to a statutory or constitutional authorization after the effective date of this section in the respective county, provided such facility has conducted a full schedule

50

of live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required licensed fee, and meets the other requirements of this chapter."

. . . .

In light of the amendment to section 551.102(4), Florida Statutes, a question has arisen as to whether the statute's third clause contemplates that a county may now hold a referendum to authorize slot machines, or, alternatively, whether the statute contemplates the necessity of additional statutory or constitutional authorization before such a referendum may be held. Based on my review of the statute, I conclude that additional statutory or constitutional authorization is required to bring a referendum within the framework set out in the third clause of section 551.102(4).

. . . I am of the opinion that the Department of Business and Professional Regulation is not authorized to issue a slot machine license to a pari-mutuel facility in a county which, pursuant to the third clause in section 551.102(4), Florida Statutes, holds a countywide referendum to approve such machines, absent a statute or constitutional provision enacted after July 1, 2010, authorizing such referendum.

(Footnote omitted.) Attorney General Opinion 2012–01 relied heavily on the location of the phrase "after the effective date of this section" within what the Opinion called "the third clause of section 551.102(4)."

Attorney General Opinion 2012-01 also relies on a mistaken reading of the second clause of the amendment; and, under the heading of legislative intent, the remarks of a single legislator made during the session in the year following the session in which Chapter 2009-170, section 19, Laws of Florida, was enacted.

General Opinion 2012-01) of the statute is de novo.  See Fla. Dep't of Children & Family Servs. v. P.E., 14 So. 3d 228, 234 (Fla. 2009).  "Legislative intent guides statutory analysis, and to discern that intent we must look first to the language of the statute and its plain meaning."  Id.  The "'statute's text is the most reliable and authoritative expression of the Legislature's intent.'  Courts are 'without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications.'"  Hooks v. Quaintance, 71 So. 3d 908, 910–11 (Fla. 1st DCA 2011) (citations omitted).

The Department's construction would render superfluous the entire third clause, the clause that begins "any licensed pari-mutuel facility in any other county," on which Gretna Racing relies.  In this connection, it must be said that Attorney General Opinion 2012–01 is correct on one point,[20] viz.:

---

[20] Attorney General Opinion 2012-01's claim that "there were no pre-effective date referenda to be excluded from the ambit of" the third clause is plainly incorrect, however.  The first clause covers pari-mutuel licensees in Miami-Dade and Broward Counties that had conducted live racing or games in 2002 and 2003.  The second clause covers pari-mutuel licensees in Miami-Dade County that had conducted live racing for two consecutive calendar years immediately preceding applying for a slot machine license.  The third clause applies to pari-mutuel licensees that conduct live racing for two consecutive calendar years immediately preceding applying for a slot machine license in any other county in which a referendum succeeds after July 1, 2010, including any such Broward County facilities that did not already have slot machine licenses, even though Broward County can be said to have conducted a "pre-effective date referend[um]."

> It is a maxim of statutory construction that a statute is to be construed to give meaning to all words and phrases contained within the statute and that statutory language is not to be assumed to be mere surplusage.[11]
>
> > [11] See, e.g., Terrinoni v. Westward Ho!, 418 So.2d 1143 (Fla. 1st DCA 1982); Unruh v. State, 669 So.2d 242 (Fla. 1996) (as a fundamental rule of statutory interpretation, courts should avoid readings that would render part of a statute meaningless); Op. Att'y Gen. Fla. 91–16 (1991) (operative language in a statute may not be regarded as surplusage).

"'When the Legislature makes a substantial and material change in the language of a statute, it is presumed to have intended some specific objective or alteration of the law, unless a contrary indication is clear.'" Altman Contractors v. Gibson, 63 So. 3d 802, 803 (Fla. 1st DCA 2011) (quoting Mangold v. Rainforest Golf Sports Ctr., 675 So. 2d 639, 642 (Fla. 1st DCA 1996)).

The Department's quibbles do not address this basic point. Contrary to the Department's assertion, Gretna Racing's interpretation does not render superfluous the phrase "pursuant to a statutory or constitutional authorization." The referendum that made Gretna Racing's horsetrack eligible for slot machine gaming licensure took place pursuant to statutory authorization. Section 125.01(1)(y),

---

Since the effective date of the statutory amendment was contingent and uncertain, see infra n.6, "pre-effective date referenda" were entirely possible and were appropriately addressed with the language "after the effective date of this section."

Florida Statutes (2012) requires "a majority vote of the total membership of the legislative and governing body," here the Gadsden County Commission, to place a question or proposition on the ballot. The Gadsden County Commissioners' vote supplied statutory authorization for the referendum.

Nor does Gretna Racing's interpretation render meaningless the routine language "after the effective date of this section." See Ch. 2009-170, § 26, at 1803, Laws of Fla. (providing in part that "[s]ections 4 through 25 [of this act] shall take effect only if the Governor and an authorized representative of the Seminole Tribe of Florida execute an Indian Gaming Compact . . ., only if the compact is ratified by the Legislature, and only if the compact is approved or deemed approved, and not voided pursuant to the terms of this act, by the Department of the Interior, and such sections take effect on the date that the approved compact is published in the Federal Register"); see also Ch. 2010-29, §§ 4-5, at 295, Laws of Fla. (amending ch. 2009-170, § 26, Laws of Fla. and providing that "[s]ections 4 through 25 of chapter 2009-170, Laws of Florida, shall take effect July 1, 2010"). The effective date of the statute was highly uncertain at the time of its enactment, and the Legislature provided that referenda "in any other county" should await the events on which the effective date depended.

The Department argues it is precluded from issuing a slot machine license to

Gretna Racing because section 551.104(2) "currently allows the Division to approve applications for slot machine permits only from pari-mutuel facilities in [Miami–Dade and Broward C]ounties as specified by article X, section 23, of the Florida Constitution." The actual text of section 551.104(2) provides, however, that an "application may be approved by the division only after the voters of the county where the applicant's facility is located have authorized by referendum slot machines within pari-mutuel facilities in that county as specified in s. 23, Art. X of the State Constitution." (Emphasis added.) Hialeah Race Track does not fall within this class. Like Gretna Racing, its eligibility depends on the statutory amendment, not the constitutional amendment. The Department granted Hialeah Race Track's application without a murmur, and it should have treated Gretna Racing's application in like fashion.

The Department's reliance on sections 551.101 and 551.104(2) to deny Gretna Racing's application is as unjustified under familiar rules of statutory construction as it is inconsistent. "When reconciling statutes that may appear to conflict, the rules of statutory construction provide that a . . . more recently enacted statute will control over older statutes. See Palm Bch. Cnty. Canvassing Bd. v. Harris, 772 So. 2d 1273, 1287 (Fla. 2000); see also ConArt, Inc. v. Hellmuth, Obata + Kassabaum, Inc., 504 F.3d 1208, 1210 (11th Cir. 2007). With regard to th[is] . . . rule, th[e Florida Supreme] Court has explained '[t]he more recently

enacted provision may be viewed as the clearest and most recent expression of legislative intent.' Harris, 772 So. 2d at 1287." Fla. Virtual Sch. v. K12, Inc., 148 So. 3d 97, 102 (Fla. 2014). The Department's reliance on this preamendment language (and the maxim inclusio unius est exclusio alterius) is, moreover, irreconcilably at odds with its issuance of a license for slot machines at Hialeah Race Track.

In sum, after Gadsden County complied with all requirements for placing the question on the ballot, a majority of Gadsden County voters approved slot machines at Gretna Racing's pari-mutuel horsetrack facility. Gadsden County held its referendum after July 1, 2010, the date the legislation amending section 551.102(4) finally took effect. The Gadsden County Commission had clear, statutory authority to place the question on the ballot. See § 125.01(1)(y), Fla. Stat. (2012); see also Crescent Miami Ctr., LLC v. Fla. Dep't of Revenue, 903 So. 2d 913, 918 (Fla. 2005) ("Florida's well-settled rule of statutory construction [is] that the legislature is presumed to know the existing law when a statute is enacted, including judicial decisions on the subject concerning which it subsequently enacts a statute." (internal quotation marks and citations omitted)); Watt v. Firestone, 491 So. 2d 592, 593 (Fla. 1st DCA 1986) (stating non-charter counties have authority

to conduct referenda[21] on casino gambling under article VIII, section 1(f) of the Florida Constitution and section 125.01, Florida Statutes). Because the countywide referendum was held "after the effective date of" the amendment to section 551.102(4), Gretna Racing is an "eligible facility," as defined in section

---

[21] "[T]he referendum power 'can be exercised whenever the people through their legislative bodies decide that it should be used.' Florida Land Co. v. City of Winter Springs, 427 So. 2d 170, 173 (Fla. 1983)." Holzendorf v. Bell, 606 So. 2d 645, 648 (Fla. 1st DCA 1992). Black's Law Dictionary 1285 (7th ed. 1999) defines "referendum" as: "1. The process of referring . . . an important public issue to the people for final approval by popular vote. 2. A vote taken by this method." Unlike a referendum required for approval of a special law (see article III, section 10, Florida Constitution, which provides: "No special law shall be passed unless notice of intention to seek enactment thereof has been published in the manner provided by general law. Such notice shall not be necessary when the law, except the provision for referendum, is conditioned to become effective only upon approval by vote of the electors of the area affected."), voter approval of slot machines does not automatically result in issuance of a license. Private parties, situated as described in Chapter 551, must then take the initiative and make application for a license. Since issues may arise regarding whether an applicant satisfies other statutory requirements for licensure, the grant of a license is not automatic.

The Department asserts, for the first time on appeal, that the favorable response of Gadsden County voters to a "sentiment" question about slot machines was not the specifically authorized referendum required by section 551.102(4). See generally D.R. Horton, Inc.- Jacksonville v. Peyton, 959 So. 2d 390, 397 (Fla. 1st DCA 2007) ("When the trial court reaches the right result, but for the wrong reasons, that decision will be upheld on appeal if there is any basis which would support the judgment in the record." (citing Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 644-45 (Fla. 1999))). The Department's argument that section 125.01(1)(y), Florida Statutes, does not authorize Gadsden County to hold a legally binding referendum regarding slot machines and that obtaining "an expression of voter sentiment" is "notably different from referring a legislative act to the people for 'final approval by popular vote'" cannot be reconciled with Watt v. Firestone, 491 So. 2d 592, 593 (Fla. 1st DCA 1986).

551.102(4).

I respectfully dissent.